Keith Milton **RHINEHART**, Petitioner-Appellee,

v.

**B. J. RHAY**, Superintendent, Washington State Penitentiary, Respondent-Appellant.

Keith Milton **RHINEHART**, Petitioner-Appellant,

v.

**B. J. RHAY**, Superintendent, Washington State Penitentiary, Respondent-Appellee.

Nos. 26301, 26098.

United States Court of Appeals, Ninth Circuit.

March 11, 1971.

As Modified on Denial of Rehearing April 14, 1971.

Malcolm Edwards, Seattle, Wash., for Keith Milton Rhinehart.

Stephen C. Way, and Lee D. Rickabaugh, Asst. Attys. Gen., Slade Gorton, Atty. Gen., Olympia, Wash., for B. J. Rhay.

Before KOELSCH, CARTER and WRIGHT, Circuit Judges.

EUGENE A. WRIGHT, Circuit Judge:

This case has a prolonged history of consideration by both state and federal trial and appellate courts. At this stage, Rhay appeals from a judgment of the federal district court ordering that the state conviction of Rhinehart be vacated unless the state should re-try him within sixty days.

We reverse because we believe that the ruling of the district court poses a standard of state prosecutorial 'conduct which is unrealistic.*

I. THE FACTUAL BACKGROUND.

Because of the peculiar history of the case and our conclusion to reverse, a somewhat lengthy recital of facts is necessary.

Petitioner Rhinehart was convicted in December 1965, on a state charge of sodomy. The state's principal witnesses were James Miller and Seattle Police Officer William R. Von Allmen. Miller was then 16 years old and had had previous difficulties with the state juvenile authorities.

He testified that he and two friends were standing on a street corner in downtown Seattle shortly after 1:00 a. m. on April 11, 1965. A light colored convertible automobile stopped across the street and its driver sounded the horn at them. Miller walked to the car and the driver, Rhinehart, initially indicated that he had mistaken Miller for someone else. He then asked Miller if he would like to make some money. Receiving an affirmative response, Rhinehart drove them to Rhinehart's apartment where Miller testified that an act of oral sodomy took place. Miller subsequently described in some detail the interior and exterior of Rhinehart's apartment.

Miller testified that Rhinehart gave him $15 in currency and drove him to the business district where Miller rejoined his friends. Rhinehart wrote his phone number on a piece of paper and told Miller to call any time he wanted to earn more money.

Miller testified that he rejoined his friends at 1:30 a. m. and went to the home of one of them to get some more money. They went back down town and "goofed around all night." When asked for more details, Miller said they had spent most of their time in "a corner restaurant", the name of which he was unable to recall.

Some time later that morning, Miller and his friends were seen by Seattle police officers standing next to a parked car. At that time, approximately 11:00 a. m., they were taken in hand for suspicion of car prowling. Since he was 16 at the time, Miller was taken to the King County Youth Center and detained there over night.[1]

The next morning he appeared before a Juvenile Court judge who determined that the evidence against him was insufficient and dropped the charges relating to the car prowling. Miller was not, however, released at that time because the juvenile authorities indicated to the court that Miller's mother was unable to control him and that he should remain at the Youth Center until proper home placement could be arranged. On April 15, Miller was released following arrangements for other living quarters,

---

* See Lessard v. Dickson, 394 F.2d 88 (9th Cir. 1968); Lee v. United States, 388 F.2d 737 (9th Cir. 1968).

1. The Youth Center and Juvenile Court are located about one mile from police headquarters and from the King County Courthouse in which the county prosecutor has his office.

and a formal order dismissing the charges was signed on April 22.

On April 13, following dismissal of the charges but while Miller was awaiting release from the Youth Center, he was visited by Officer Von Allmen. The officer inquired about his contact with Rhinehart the night before he was arrested. Miller said he didn't know for sure how Von Allmen heard about it but guessed the other two boys must have told him. Miller gave the facts and signed a statement which Von Allmen first prepared and reviewed with him.

The charge of sodomy was then filed against Rhinehart. Miller was subsequently released from the Youth Center and prior to trial was visited by a Mrs. Lemmon who was a friend of Rhinehart's and from time to time had attended services at the Aquarian Church where Rhinehart was an ordained minister.

After meeting Mrs. Lemmon, Miller went to the office of Rhinehart's trial counsel and signed a second statement, in which he said, "There was no sexual act of any description between Rev. Rhinehart and myself." He added that the police had influenced him to sign the original statement because "they were really out to get Rhinehart and they needed a statement from me to help them." He added that he had "met Rev. Rhinehart and he had taken me to his home where I had confided my problems to him and he had tried to help me."

Following his contact with Mrs. Lemmon and his new statement but still prior to the trial, Miller signed a third statement which repeated the incident as he had originally reported it to the police. He repudiated the statement given to Rhinehart's attorney and explained that it had been given because he was anxious to leave Seattle and Mrs. Lemmon had promised him a ticket to Alaska if he would copy a statement she had prepared and sign it.

He said he was later told that he would not get the ticket but instead that she would buy him new clothes. He indicated that she had bought him $80 worth of clothing and she testified to the same effect, adding that she had done so for humanitarian reasons and that it had nothing to do with Miller's statement. Miller also said that Mrs. Lemmon had given him money at that time and on one additional occasion, a fact which Mrs. Lemmon also confirmed in her testimony.

Rhinehart testified to his version of the incident with Miller. He said that he had stopped and sounded his horn, thinking that Miller was the son of a member of his congregation. Learning his error, he told Miller but the boy expressed an interest in Rhinehart's car and asked for a ride. Rhinehart agreed.

As they were driving the boy told Rhinehart that he would permit Rhinehart to perform homosexual activity on him for a price. Rhinehart said he declined and told Miller that he was a minister and, though he knew many homosexuals, was not so inclined himself. He denied that Miller had been to his apartment for either sexual or counseling reasons.

The defense version therefore was that Miller was a male prostitute who had made unsuccessful advances at Rhinehart. When Officer Von Allmen testified he was asked if he knew of any incidents of Miller "hustling" homosexuals and he replied that he did not.

To support this theory, the defense called a witness who testified that he had been approached by Miller, some time after the Rhinehart incident, at a homosexual rendezvous where Miller expressed willingness to engage in deviant conduct for a price.

The defense sought to show that Rhinehart had been singled out for prosecution because of his association with the Aquarian Foundation which advocates sexual freedom and because of his recent appearance on a television show with homosexuals and an interracial married couple.

In furtherance of this theory, the defense offered to prove the existence of other local homosexual gathering places where overt acts of homosexuality took place under the approving eyes of Seattle police officers. The offer of proof was rejected and is the basis of Rhinehart's cross-appeal, discussed in Section V, *infra*.

Rhinehart's conviction was appealed to the Washington Supreme Court which unanimously affirmed and subsequently denied a petition for rehearing. State v. Rhinehart, 70 Wash.2d 649, 424 P.2d 906 (1967). His petition for certiorari was denied by the Supreme Court. Rhinehart v. Washington, 389 U.S. 832, 88 S.Ct. 102, 19 L.Ed.2d 92 (1967).

After his incarceration in the Washington State Penitentiary, Rhinehart filed a petition for writ of *habeas corpus* in the federal district court. That petition was denied without hearing and his appeal to this court resulted in a remand to the district court directing a hearing on the questions of equal protection and alleged use of perjured testimony. Rhinehart v. Rhay, 409 F.2d 208 (9th Cir. 1969).

After the remand, the district court heard detailed testimony on the circumstances of Rhinehart's trial and the several statements of Miller. The court concluded that Rhinehart's claimed denial of equal protection was without merit but ruled that he be retried or released within 60 days because his "conviction was obtained in violation of the due process clause of the United States Constitution in that he was convicted of a crime by a trial in a State court in which material evidence in the possession of the State was withheld from him and therefore was suppressed." [2]

The district court went on to point out that, in its view of the evidence, "[s]uch suppression, although unwitting and unintentional insofar as the prosecutor was concerned, was a 'knowing' suppression in the sense required by the due process clause and the cases decided thereunder, such as Giles v. Maryland, 386 U.S. [66] 71, 87 S.Ct. 793 [17 L. Ed.2d 737] (1967)." [3]

Rhay appealed and Rhinehart has filed a cross-appeal objecting to the district court's refusal to hear evidence concerning his equal protection claim.

## II. STATEMENTS OF THE PRINCIPAL WITNESS, MILLER.

In our remand to the district court, we noted Rhinehart's claim that "perjured testimony was knowingly used by the state." [4] and ordered an evidentiary hearing on this point because the adequacy of previous state court findings "has been subjected to serious doubt by new evidence contained in the principal witness' latest retraction." [5]

The district court went somewhat beyond the scope of the remand order in its inquiry into matters other than the retraction by Miller. We shall, however, examine in detail the numerous statements which Miller has given during the course of these proceedings to illustrate our conclusion that the statements themselves do not substantiate Rhinehart's claim that Miller perjured himself with the knowledge of the state.

All told, Miller has related his side of this story six times! In addition to his testimony at trial as recounted above, he has signed five statements which alternately affirm and deny the charge that an act of oral sodomy took place.

(a) *First statement, April 13, 1965, confirming the act.*

Miller's first statement was given to Seattle police on April 13, 1965, while he was in the Seattle Youth Center awaiting placement in a proper home. It is

2. Pertinent Findings of Fact and Conclusions of Law from the district court's unreported decision are set forth in Appendix A hereto.

3. Conclusion of Law III, Appendix A, *infra*, at 5.

4. Rhinehart v. Rhay, 409 F.2d 208 (9th Cir. 1969).

5. *Id.*

consistent with his trial testimony, reciting his meeting with Rhinehart, the act of sodomy, the payment of $15, and a detailed description of Rhinehart and his apartment.

(b) *Second statement, May 17, 1965, denying the act.*

His second statement was given at the office of Rhinehart's trial counsel on May 17, 1965, prior to Rhinehart's trial, following his contact by Mrs. Lemmon. Miller there denied any sexual act with Rhinehart and stated that he had signed the original statement because of police pressure. Miller said he had gone to Rhinehart's home, confided his problems and received advice. This conflicts with Rhinehart's trial testimony to the extent that Rhinehart testified that while he did give Miller a ride in his car he did not take Miller to his apartment for any purpose.

(c) *Third statement, June 11, 1965, confirming the act.*

Miller gave his third written statement to the police on June 11, 1965, a month before the trial began. He reaffirmed the facts originally given as to the commission of the sexual act, etc., and explained the second statement by the promise of the ticket to Alaska. He said he had copied and signed a statement prepared by someone else. Subsequently he was told that he would not get the Alaska trip but instead was given $80 worth of new clothing and some cash. He repeated this explanation when he testified at Rhinehart's trial.

(d) *Fourth statement, September 26, 1966, denying the act.*

Miller's fourth statement was also given to Rhinehart's attorney on September 26, 1966, following the conviction but during the pendency of the appeal to the Washington Supreme Court. It is somewhat more consistent with Rhinehart's trial testimony in that Miller denied ever having been to Rhinehart's home. He said that he gave the statement to Mrs. Lemmon because it was true. This does not, however explain why he indicated to Mrs. Lemmon that he had gone to Rhinehart's home for counseling and now denies ever having been there.

This fourth statement was thus a part of the record before us when Rhinehart appealed the denial of his petition for writ of habeas corpus and it was this "latest retraction" that formed the basis of our remand to the district court.

(e) *Fifth statement, October 28, 1969, confirming the act.*

Miller's fifth statement was given to two members of the staff of the Washington Attorney General on October 28, 1969, following our remand to the district court. At that time, Miller was in the *Oregon* State Correctional Institution. Miller reaffirmed his trial testimony, and explained that he gave the September 26, 1966 statement to Rhinehart's attorney because he had gone to Rhinehart's apartment at the urging of a friend who said that Rhinehart had given him a car to search for Miller and that if Miller would go to Rhinehart's apartment, he (the friend) had been told that the car would be his to keep.

In fairness to counsel, we hasten to point out that Miller's fourth statement (September 26, 1966) stated that counsel had "questioned him hard" about all this and repeatedly warned him that he wanted only the truth, no matter how it affected his client. While Miller subsequently denied the majority of that statement, he specifically reaffirmed this conduct of counsel and we feel compelled to point out that there is no suggestion whatever that Rhinehart's present attorney who has handled this matter with considerable skill and diligence had anything to do with the substantive content of Miller's fourth statement.

At the conclusion of this fifth statement, Miller said it was made of his free will without coercion or promise of leniency. We think that statement is entitled to considerable weight since Miller was at that time in custody in *Oregon*. While he may not have been happy with it, Rhinehart apparently de-

cided not to pursue Miller further since counsel stipulated that Miller's most recent statement would be admitted at the evidentiary hearing before the district court in lieu of a deposition where both parties might examine him.

### (g) *Conclusion.*

At this point in the proceedings, we believe that the record before the district court, by stipulation of counsel, was such that further inquiry was unnecessary and that any doubt created by Miller's 1966 statement was dispelled.[6] On this basis alone we believe that the record fails to show either perjured testimony or knowing use by the state and that Rhinehart's writ of habeas corpus should have been denied. However, since the district court inquired further, we consider the remaining questions raised by the evidentiary hearing which ultimately led to the district court's order of retrial or release.

### III. SUPPRESSED EVIDENCE.

▮▮▮▮ The district court concluded that Rhinehart's conviction violated due process because it was obtained during a trial at which evidence was "suppressed" as that term has been defined in recent decisions of the Supreme Court, particularly Giles v. Maryland, 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967). First, we consider other cases prior to *Giles* to

point up the crucial question presented: What constitutes suppression of evidence violative of due process?

This review demonstrates that due process is violated only where there is false testimony which is knowingly used by the state during criminal proceedings. The circumstances of this case not only convince us that the testimony in question was not false but also that it was not, per the explicit findings of the district court, knowingly used by the state.

It is clear that the state may not use the false testimony of a witness where the prosecutor or other representative of the state knows the testimony to be false.[7] This principle applies equally where the testimony is unsolicited by the state but allowed to go uncorrected.[8] It makes no difference whether the false testimony goes to substantive aspects of the offense,[9] the credibility of the witness,[10] or the ultimate punishment of the accused.[11] Further, it is irrelevant that the prosecutor acted in good faith if in fact he knew the testimony was false.[12] Finally, the defense need not show that the true state of the facts would necessarily have resulted in an acquittal since "[t]he false testimony used by the State is securing the conviction * * * may have had an effect on the outcome of the trial." [13]

---

6. In view of Miller's numerous statements alternately affirming and denying the sexual act we think it difficult to speak of "truth" in the abstract sense. We would first note, however, that Miller had once retracted his statement prior to trial and that the jury was informed of that retraction when it rendered its verdict of guilty. In many respects, the record is not significantly different than it was when the question of Miller's veracity was presented to the jury. That is, his latest statement affirms the act in question and explains why previous statements denying it were given. Further, we think it significant to note that all three statements confirming the incident are not only consistent with one another but also consistent with his trial testimony. The two statements denying it are inconsistent with each other in that the first stated that Miller had been to

Rhinehart's home for counseling whereas the second, consistent with Rhinehart's trial testimony, denied his having been there for any reason. Finally, we note that Miller has indicated why he gave each of the two statements denying the incident.

7. Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935).

8. Alcorta v. Texas, 355 U.S. 28, 78 S.Ct. 103, 2 L.Ed.2d 9 (1957).

9. Miller v. Pate, 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967).

10. Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).

11. Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L.Ed.2d 215 (1963).

12. *Id.*

13. Napue v. Illinois, *supra* n. 10, 360 U.S. at 272, 79 S.Ct. at 1179.

The first question, therefore, is whether there was in fact false testimony. Without explicitly saying that certain portions of the testimony were false, the district court suggested that the testimony on Miller's status at the time of his first statement, his testimony that Rhinehart gave him $15 and Officer Von Allmen's testimony were somehow less than true and that the true state of facts was suppressed.

(a) *Miller's status at the time of his original statement to the police.*

The prosecution emphasized to the jury that Miller's original statement to the police was entitled to great weight because he had been cleared of the car prowling charge and had nothing to gain. Miller accurately appraised the jury of the true facts at the time:

"Q. Where did he [Officer Von Allmen find you?

A. In the Youth Center.

Q. In other words, you were still in custody?

A. Yes, I was still in—they never let me out yet.

Q. Didn't you say the judge said you could go home?

A. They said I could.

Q. But you hadn't been let out?

A. I hadn't been let out, yes."

The jury knew of his continuing detention at the time the statement was made although he was not actually released from custody until two days later and a formal order was not signed until some time thereafter.[14]

There was no false testimony concerning Miller's status at the time the original statement was given.

(b) *Miller's testimony that Rhinehart gave him $15.*

Rhinehart and the district court decision [15] suggest that Miller's testimony that Rhinehart gave him $15 must have been false because the records of the Youth Service Center show that he had but $6.06 when arrested on the car prowling charge. This fails to take into account that he spent nearly ten hours in a corner restaurant between the time he met Rhinehart and the time he was arrested. Thus, the Youth Center records do not establish that this testimony was false.

Further, Miller did not testify that he had all of this money with him when he was arrested.[16]

(c) *Officer Von Allmen's testimony.*

To support the defense theory that Miller had solicited Rhinehart unsuccessfully, Officer Von Allmen was interrogated about his knowledge of similar activity on Miller's part. He said that he had no direct personal knowledge of any incidents of solicitation by Miller.[17]

14. The district court's Findings of Fact I–IV are substantially in accord with our view of the record in this area. *See* Appendix A, *infra* at 1–2.

15. *See* Finding of Fact V, Appendix A, *infra,* at 2–3.

16. On direct examination Miller testified that following the incident with Rhinehart he returned to downtown Seattle and thereafter went to the home of one of his friends for more money. They then went back downtown. The testimony at that point was:
    Q. Did you still have your money with you?
    A. Yes.
    Q. And then what happened after you got downtown did you get involved in this other thing with the prowling of cars?
    A. Yes.
    From this testimony alone there is some confusion as to the actual time sequence involved and, taken alone, it is argued that Miller testified falsely. However, on cross-examination the time sequence was clarified to show that Miller's arrest did not take place until around 11:00 a. m. and that the interim had been spent "goofing around" in the "corner restaurant." On the record as a whole, therefore, it is apparent that Miller did not testify that he had the $15 with him when he was arrested.

17. When asked about Miller's activities, Von Allmen said he had had no contact with him following his release from the

This is said to be false [18] because Von Allmen had previously written of Miller, "Subject is known to hustle homo's." This appears in a police report filed by Von Allmen after Miller was picked up at home following his failure to appear for the first Rhinehart trial.

In addition, a parole violation report filed thereafter by the juvenile authorities indicated:

"*Suspicions:* Officer Von Allmen of the Seattle Police Department feels that Jim has been having more homosexual contact in the last two weeks for monetary reasons. While on the run between June 7th and June 11th, Jim was staying overnight in the Green Parrot Theater. This is a homosexual hangout. It is not believed that Jim is seriously homosexual but it is felt that he has taken up this method to get spending money."

From these statements, Rinehart argues that Von Allmen falsely testified when he said that he had no knowledge of any incidents of solicitation by Miller. Von Allmen testified at the evidentiary hearing before the district court and stated that, when he made this statement, he "was merely making an assumption." He indicated that he knew of no incidents where Miller had actually solicited homosexuals and that his report was based on the fact that Miller had been frequenting a known homosexual rendezvous. He assumed from that (and from Miller's contact with Rhinehart) that Miller was involved with homosexuals, probably for money.

The record shows that Von Allmen has twice testified under oath that he had no direct personal knowledge of Miller having solicited homosexuals. The unsworn cryptic statement in his police department report (and the juvenile report setting forth his suspicions) do not make this testimony false. He may have had suspicions but no knowledge of specific incidents.

This aspect was well fortified by the *direct* testimony of a defense witness, McClure, who told the jury that he had been solicited by Miller. To the extent that Von Allmen's suspicions were helpful to the defense, no "suppression" thereof was violative of due process. Even assuming that any information was suppressed we cannot conclude that due process requires reversal. Due process does not require "that convictions ought to be reversed on the ground that information merely repetitious, cumulative, or embellishing of facts otherwise known to the defense or presented to the court * * * was not disclosed to defense counsel." [19]

The theory that Miller was a male prostitute was presented to the jury by the McClure testimony. Von Allmen's suspicions would have been of little assistance. Assuming that he would have been allowed to testify as to his suspicions had he been asked,[20] the failure to clarify the point was the result of inadequate cross-examination rather than the knowing use of false testimony.[21]

Youth Center on April 15. The testimony then proceeded:
Q. Did you have any way of knowing if he did anything gainful for a living?
A. I would not, no.
Q. Do you know whether there has been any incident of solicitation by him for immoral acts since that time?
A. I have no knowledge of any.

18. *See* Finding of Fact VII, Appendix A, *infra*, at 3.

19. Giles v. Maryland, 386 U.S. 66, 98, 87 S.Ct. 793, 809, 17 L.Ed.2d 737 (1967) (Fortas, J. concurring).

20. Von Allmen could undoubtedly have been called upon to testify as to Miller having spent time at places where homosexuals were known to congregate. It is, however, doubtful that he would have been allowed to testify as to his suspicions based on this knowledge. *See, e. g.,* Johnson v. Caughren, 55 Wash. 125, 104 P. 170 (1909).

21. *See* Birns v. Perini, 426 F.2d 1288, 1291 (6th Cir. 1970), petition for cert. filed, 39 U.S.L.W. 3170 (U.S. Sept. 1, 1970) (No. 630).

## IV. THE EFFECT OF GILES.

We do not believe that Giles v. Maryland, 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed. 2d 737 (1967), relied upon by Rhinehart and the district court, changes the basic rules concerning suppression of evidence and knowing use of false testimony by the state. The Court in *Giles* specifically declined to decide "whether the prosecution's constitutional duty to disclose extends to all evidence admissible and useful to the defense, and the degree of prejudice which must be shown to make necessary a new trial." [22] The lack of a majority opinion plus the differing views taken by the concurring and dissenting justices suggest numerous possible interpretations of the effect of that decision.[23]

As we view *Giles*, the result was based in part upon prosecutorial knowledge [24] of the reports involved there combined with complete frustration of defense efforts to obtain the information.[25] Here, the district court explicitly found that the prosecutor was unaware of the police and juvenile reports [26] and the record clearly shows a total lack of effort by the defense to secure these reports despite the fact that the defense was well aware of Miller's involvement with the police and juvenile authorities.

This being neither a case of deliberate use by the prosecutor of false testimony nor a frustrated effort by the defense to obtain information, the record must show "a substantially higher probability that disclosure of the evidence to the defense would have altered the result." [27] We have seen that the testimony used was not, in fact, false and knowledge by the defense of the reports would have been helpful only to the extent that they may have assisted in Miller's impeachment.

The jury may have believed the defense theory that Miller was a male prostitute and still not acquitted Rhinehart since the statute under which he was prosecuted applies without regard to who was the instigator. The jury would have to conclude that not only did Miller initiate this activity but that Rhinehart refused the offer. There is nothing in these reports to support that aspect of the defense.

In short, this is not a case like *Giles* where the defense theory (consent), if believed, would have resulted in acquittal. Rather this information would have

22. Giles v. Maryland, *supra* n. 19, 386 U.S. at 74, 87 S.Ct. at 797.

23. *Compare* Birns v. Perini, 426 F.2d 1288 (6th Cir. 1970), petition for cert. filed, 39 U.S.L.W. 3170 (U.S. Sept. 1, 1970) (No. 630), *with* Hamric v. Bailey, 386 F.2d 390 (4th Cir. 1967).

24. The precise extent to which the prosecutor was aware of the police and juvenile reports in *Giles* is somewhat unclear. As to the police reports, the Court specifically found that the prosecutor had read them before trial. Giles v. Maryland, *supra* n. 19, 386 U.S. at 77, n. 7, 87 S.Ct. 793, 17 L.Ed.2d 737. As to the activity of the complaining witness between the time of the alleged rape and the time of trial, it is also clear that the police lieutenant who conducted the investigation for the prosecution had been personally informed. *Id.* at 70–71, 87 S.Ct. 793.

25. Defense counsel in *Giles* attempted to secure information regarding certain juvenile court proceedings but was told that the information would not be made available. Giles v. Maryland, *supra* n. 19, at 72, 87 S.Ct. 793. In addition, defense attempts to secure the police reports during post-conviction proceedings were similarly unsuccessful. *Id.* at 74, 87 S.Ct. 793.

26. The district court twice found that the prosecutor was not aware of this material:

"The deputy prosecuting attorney was not personally aware of the evidence contained in the records. * * *" Finding of Fact VIII, Appendix A *infra*, at 4.

"Such suppression, although unwitting and unintentional insofar as the prosecutor was concerned. * * *" Conclusion of Law III, Appendix A, *infra* at 5.

27. United States v. Keogh, 391 F.2d 138, 148 (2d Cir. 1968). *See also* United States v. DeLeo, 422 F.2d 487, 499 (1st Cir.), cert. denied, 397 U.S. 1037, 90 S.Ct. 1355, 25 L.Ed.2d 648 (1970).

been helpful only to the extent that it impeached the testimony of Miller and further questioned his credibility. The credibility of Miller was already so substantially in question [28] that we cannot believe that this additional information would have altered the result.

We are not suggesting that there may not be cases where, despite lack of prosecutorial knowledge or defense efforts, the information later revealed might be such as to raise some serious question as to the likelihood of a different result. No new theory is advanced as a result of this information and we think it cumulative at best.[29]

## V. EQUAL PROTECTION.

■ Rhinehart's basic contention here is that he was denied equal protection because he was singled out for arrest under the state sodomy statute. He offered to prove this contention in the district court with affidavits to establish that homosexual activity regularly takes place in specific centers of deviant activity in Seattle under the approving eyes of the Seattle police. Having heard the offer of proof as required by our remand,[30] the district court concluded that even if Rhinehart were to establish his contention he would not make out a denial of equal protection. We agree.

First, his contention that he was "singled out" for prosecution was fully considered by the Washington Supreme Court [31] which ruled against him because the record amply establishes that there were numerous other prosecutions under this statute both before and after

Rhinehart's. Second, it is quite clear that a claim that others violate a statute with impunity does not make out a denial of equal protection unless it is shown that there is some form of discrimination in the actual enforcement of the statute.[32]

## VI. CONCLUSION.

For the reasons set forth in Sections I–IV, *infra,* the judgment of the district court ordering Rhinehart's release or retrial is reversed.

### APPENDIX A
District Court Findings of Fact and Conclusions of Law.

Rhinehart v. Rhay, Civil Action No. 8447

(W.D. Wash., April 24, 1970).

### FINDINGS OF FACT

I

At the State court trial of the Petitioner, the principal prosecution witness was James Miller, a sixteen-year-old-boy. James Miller gave to law enforcement officers his first statement incriminating the Petitioner on April 13, 1965. On the day before, James Miller had been arrested on suspicion of a car prowling offense, and at the time that he gave such statement, he was still at the detention facilities where he had been held since his arrest. Several days later, but still prior to the trial of the Petitioner, he gave a statement to the Petitioner's attorney in which he repudiated the statement of April 13. Then, at the trial, he in turn repudiated the la-

---

**28.** This is not a case where the witness' credibility was not previously questioned. The jury was aware that Miller had been in trouble with the police. They were also informed that he had once retracted his statement implicating Rhinehart in an act of sodomy (and then reaffirmed it) prior to trial. Defense counsel described Miller as "incorrigible at this point, a complete and utterly depraved child and an opportunist who seized on this particular opportunity to implicate somebody here for his own benefit." The prosecutor agreed with this analysis and told

the jury that Miller was "essentially an ammoral [sic] individual; and I'm not sure that if Mr. Miller had anything to gain by it he wouldn't lie."

**29.** *See* note 19, *supra,* and accompanying text.

**30.** Rhinehart v. Rhay, 409 F.2d 208 (9th Cir. 1969).

**31.** State v. Rhinehart, 70 Wash.2d 649, 656, 424 P.2d 906, 913 (1967).

**32.** *See* Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886).

728

ter statement and went back to his story of April 13.

## II

Miller also testified at the trial that he had been cleared of all charges against him at the time that he gave the statement to the police on April 13, 1965.

## III

The credibility of Miller at the trial of the Petitioner was an issue of major significance. This was acknowledged by the prosecuting attorney in his argument to the jury. The prosecuting attorney also expressed the view that James Miller would probably lie if he had anything to gain thereby. He insisted, however, that Miller's testimony should be accepted; that it was consistent with the statement of April 13; and that such statement should be accepted and believed because on April 13 Miller had already been freed from the control of the authorities and thus had nothing to gain by cooperating with the police by giving an incriminatory story against the Petitioner. The prosecuting attorney asserted that there was no evidence to the contrary.

## IV

The Juvenile Court records in King County Juvenile Court Cause No. 33572 indicate that James Miller attended a hearing on April 12, 1965, and no formal disposition was made of the charges against him at that time. (The affidavit of Dan Peyton and the offer of proof made by the Respondent indicate that the court announced that it was dismissing the car prowling charge for lack of evidence, but continued the matter and continued Miller's detention at the request of Daniel Peyton, King County Juvenile Court parole counsellor. The affidavit further indicates that from and after April 12, 1965, to the time of James Miller's release that Miller's liberty was dependent upon a recommendation to the Juvenile Court by Daniel Peyton.) James Miller was actually re-

leased from custody on April 15, 1965; he was not formally cleared of the car prowling charge until April 22, 1965.

## V

Miller testified at the State court trial of the Petitioner that the Petitioner had paid Miller $15.00 for an act of sodomy. He further testified that at the time he was arrested, he still had the $15.00 allegedly given him by the Petitioner. The Youth Service Center is a detention facility maintained in connection with the King County Juvenile Court. The Youth Service Center property card prepared at the time of Miller's arrest shows that Miller had but $6.06 on his person at the time that he was arrested.

## VI

Included within the issue of James Miller's credibility at the trial was the question of whether or not he was a male prostitute or otherwise knowledgeable in homosexual activities, as opposed to having been an innocent victim of the Petitioner's advances.

## VII

At the time of the Petitioner's State court trial on July 14 and 15, 1965, Officer Von Allmen testified that he had no knowledge of Miller's solicitation of homosexuals. However, Officer Von Allmen, in his SPD Person Investigated Report dated June 16, 1965, recited that "the subject is known to hustle homos." The Juvenile Court document entitled "Parole Violation Report" of Daniel Peyton dated June 14, 1965, also stated in part as follows:

"Officer Von Allmen of the Seattle Police Department feels that Jim has been having more homosexual contact in the last two weeks for monetary reasons. While on the run between June 7th and June 11th, Jim was staying overnight in the Green Parrot Theater. This is a homosexual hangout. It is not believed that Jim is seriously homosexual, but it is felt that he has taken up this method to get spending money."

## VIII

Thus, the records of the Juvenile Court, the Youth Service Center, and the Seattle Police Department contained highly relevant information to the effect that on April 13, 1965, Miller was still in custody of law enforcement authorities and remained in such custody for two additional days. Also, as noted above, such records contained additional evidence pertinent to the credibility of Miller. The deputy prosecuting attorney was not personally aware of the evidence contained in the records mentioned in this paragraph, but such records were available to him and they were not available to the Petitioner or his attorney.

## IX

The Petitioner's offer of proof with respect to his claim of denial of equal protection of the laws, even if true, does not establish that his constitutional rights were violated in this respect. Such offer of proof was therefore rejected.

\*　　\*　　\*　　\*　　\*　　\*

## CONCLUSIONS OF LAW

\*　　\*　　\*　　\*　　\*　　\*

## III

The Petitioner's conviction was obtained in violation of the due process clause of the United States Constitution in that he was convicted of a crime by a trial in a State court in which material evidence in the possession of the State was withheld from him and therefore was suppressed. Such suppression, although unwitting and unintentional insofar as the prosecutor was concerned, was a "knowing" suppression in the sense required by the due process clause and the cases decided thereunder, such as Giles v. Maryland, 386 U.S. 66, 71, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967).

\*　　\*　　\*　　\*　　\*　　\*

## VI

The Petitioner's conviction should be vacated and the charges against him dismissed with prejudice unless the Petitioner is retried within sixty days of the date of entry of the Order hereon.