342 A.2d 250.

### IN RE GERARD T. OUIMETTE.

#### JULY 21, 1975.

PRESENT: Roberts, C. J., Paolino, Joslin, Kelleher and Doris, JJ.

KELLEHER, J. We have issued our writ of certiorari to consider the petitioner's contention that his conviction on a charge that he conspired with others to murder Michael Greene and Homer George Perkins is the direct result of the denial of his right to due process because the prosecution suppressed evidence which favored the petitioner.

The conspiracy trial was held before a Superior Court jury in early 1972. The trial lasted 8 weeks. The prosecution's main witness was William H. Miller, Jr. Miller told the trial justice and the jury that he had met petitioner while they were both incarcerated at the Adult Correctional Institutions. He claimed that they worked together in the prison laundry and that as a result of this association a friendship between the two ripened to such a point that Miller, at petitioner's urging, agreed to kill a Homer Perkins for a price of $5,000. Later, the agreement was broadened to include as a second victim one Michael Greene who had allegedly beaten up petitioner's brother, John. Miller was paroled on September 30, 1969. Once he was on the street, he contacted John Ouimette, and they along with a Ronald H. Sweet, Jr. and a Gerald M. Tillinghast embarked upon a plan whose ultimate goal was the elimination of Perkins and Greene. Miller detailed a series of meetings with his fellow conspirators, the procurement of firearms, and the periodic reconnoitering of the different places where Perkins and Greene were likely to be in each other's company. Miller testified

that on the evening of October 21, 1969, while he was walking along the street upon which Greene lived, he saw Greene leave his car and approach another car. Shots were fired and Greene was killed.[1]

A number of witnesses testified for the defense. Each witness contradicted some aspect of Miller's testimony. Two depositions of prisoners who served time with Miller when he was at a federal penitentiary in Leavenworth, Kansas, were read to the jurors. The thrust of their contents was that Miller had told the affiants that he knew nothing about Greene's killing but that in view of the other charges then pending against him and because of police persuasion, he would appear as a prosecution witness against petitioner and hope that his cooperation would cause the Rhode Island authorities to show a similar cooperative attitude towards him.

The jury returned guilty verdicts against petitioner and Sweet and acquitted petitioner's brother John and Tillinghast. The petitioner and Sweet filed a motion for a new trial and in support thereof they filed as newly discovered evidence an affidavit signed by Miller's wife. In her affidavit, the wife asserted that her husband had lied at trial; that Miller remained at home the night of Greene's death; that contrary to her husband's courtroom testimony, Miller had never remained away from their home without her at night within the period during which he was allegedly planning the demise of Greene and Perkins; and that she had advised two Providence police detectives of "these facts." The detectives filed counter-affidavits in which they denied ever having any conversation with Mrs. Miller about her husband's association with petitioner, his brother John, Sweet, or Tillinghast.

---

[1] The petitioner's brother Frederick and Ronald H. Sweet, Jr. were charged and indicted for this homicide. Their convictions were affirmed. *State* v. *Ouimette*, 110 R. I. 747, 298 A.2d 124 (1972).

In denying the motion for a new trial, the trial justice characterized Miller as "the key witness in this trial" and found corroboration of the story he told from other facets of the testimony he had heard. In rejecting Mrs. Miller's affidavit because it was "cumulative" and "impeaching" in nature, the trial justice pointed out that the affidavits of the federal prisoners presented a much broader attack on Miller's credibility. The substance of the wife's affidavit, he said, was a suggestion that her husband should not be believed because he was not out of the house when he said he was. Such an attack on her spouse's veracity, the trial justice observed, overlooked the really crucial issue, that of whether petitioner and Miller had agreed that Greene and Perkins would be done away with for a price. In disregarding the wife's affidavit, the trial justice stressed that the evidence of no conspiracy was found in the prisoners' affidavits when they stated that Miller told them he knew nothing about a conspiracy and did not want to lie.

The motion for a new trial was denied on May 31, 1972. No timely appeal was taken in the conspiracy case. Subsequently, in July 1972, petitioner and Sweet filed a petition for a writ of coram nobis using as its basis the affidavit of Miller's wife. The trial justice denied the petition, apparently on the basis that he had decided the identical issue when he denied the motion for a new trial. Sweet took an appeal from the denial but subsequently abandoned it. The petitioner took no appeal.[2] Sometime thereafter this proceeding was initiated.

As we proceed to consider the question of the asserted suppression of evidence which was favorable to petitioner,

[2]We have earlier set forth the travel of the conspiracy case, the filing of Mrs. Miller's deposition, the denial of the coram nobis petition, and the failure to invoke the available statutory appeals. *In re Ouimette,* 114 R. I. 912-14, 329 A.2d 408-409 (1974).

we have neither a transcript of the 8-week trial nor an agreed statement of facts describing what transpired in the trial court. Our narration of the facts is gleaned from the 26-page transcript of the trial justice's denial of the new trial motion.

There is a suggestion from comments made by the trial justice in denying the new trial motion that the alleged prosecutorial suppression of Mrs. Miller's conversation with the police was never an issue in the Superior Court. However, there is no question that that is the tack now being taken before us.

The standard which a court must apply in considering a motion for a new trial on the basis of newly discovered evidence is that the newly discovered evidence must be such that it would "probably change" the verdict. *State v. Carsetti,* 111 R. I. 642, 306 A.2d 166 (1973). However, where the evidence has been in the possession of the prosecution, the defendant's ability to prepare his defense has been impaired through no fault of his own. Consequently, logic dictates that there be one standard for a "newly discovered evidence" case and another for a case involving "suppression or nondisclosure of evidence." Such a difference has been recognized. *State v. Dukette,* 113 N. H. 472, 309 A.2d 886 (1973).

The problems arise when the courts attempt to determine where the suppression or nondisclosure necessitates a new trial. It is clear that the nondisclosure of evidence favorable to the accused can give rise to an error of constitutional proportions. The easiest cases to resolve are those where there has been a deliberate deception of the court or jury by the presentation of known false testimony by the prosecutor, or by his failure to correct false evidence or perjury, which although unsolicited is nonetheless put before the court. *Napue v. Illinois,* 360 U. S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); *Mooney v. Holohan,*

294 U. S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935). The Supreme Court has consistently found that such conduct gives rise to a violation of due process. This is so even where the perjury or deliberate suppression was relevant solely to sentencing. *Alcorta* v. *Texas,* 355 U. S. 28, 78 S.Ct. 103, 2 L.Ed.2d 9 (1957); *Napue* v. *Illinois, supra;* and *Giglio* v. *United States,* 405 U. S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), made it clear that the perjury did not have to be directly concerned with the issue of defendant's guilt or innocence, but could relate solely to the credibility of a state's witness.

It is easy to understand the results in such cases. Where the prosecutor has deliberately caused false evidence to influence some part of the criminal trial, he has violated the most basic precepts of due process. The courts cannot allow the integrity of the criminal system to be undermined by the over-zealous prosecutor. Thus, the Court in *Napue* did not inquire into the extent of harm caused the defendant by the misconduct. The state's witness had testified that the state had not offered him any special treatment because of his willingness to appear at trial when in fact the district attorney's office had done just that. The suppressed fact would only have gone to that witness' credibility, however, and the jury already had before it the witness' admission that some unidentified lawyer offered to help him get his sentence lessened. The conviction was still overturned. In *Giglio,* the "key" prosecution witness denied that he had been offered leniency in exchange for his testimony. An assistant United States Attorney General who had presented the case to the grand jury knew that such an offer had been made. The government's trial attorney was unaware of the offer. Chief Justice Burger in overturning the conviction wrote that a new trial was required if there was "any reasonable likelihood" that the "false testimony" could "have affected

the judgment of the jury." 405 U. S. at 154, 92 S.Ct. at 766, 31 L.Ed.2d at 108. The Chief Justice in ordering the new trial observed that the failure of one prosecutor to inform his superior or associates of the promise was immaterial. He also emphasized that the witness' testimony was crucial to the government's case.

After *Napue* v. *Illinois, supra,* the lower federal courts began to extend the prosecutor's duty to disclose, and to overturn convictions when there was no prosecutorial misbehavior but merely a negligent failure to make known to the defense evidence which could have proved favorable. *Kyle* v. *United States,* 297 F.2d 507 (2d Cir. 1961); *see also United States ex rel. Thompson* v. *Dye,* 221 F.2d 763 (3d Cir. 1955). Finally, in *Brady* v. *Maryland,* 373 U. S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Court explicitly adopted the broadened approach of the lower courts and held "* * * that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady* v. *Maryland, supra* at 87, 83 S.Ct. at 1196, 10 L.Ed.2d at 218.

Thus, the focus had been shifted. No longer would reversal be mandated only upon a showing of deliberate prosecutorial misconduct, the constitution also required a new trial for passive or negligent prosecutorial failure to disclose certain evidence. By its language, *Brady* mandates a new trial upon the showing of a suppression or nondisclosure of *material* evidence which is *favorable* to the accused. This has been seen by the commentators as requiring that the courts focus on the harm caused the defendant by his lack of evidence which was within the state's possession. *The Prosecutor's Constitutional Duty to Reveal Evidence to the Defendant,* 74 Yale L. J. 136 (1964). The overturning of a conviction for a prosecu-

torial violation of the duty to disclose is thus governed by several principles: the need to deter prosecutorial misconduct and dampen the temptation for public officials to search for convictions rather than the truth, and the importance of remedying the harm caused a defendant by a trial in which all the facts do not come out. The first principle governed the early cases, the second became paramount in *Brady*. In addition, however, and balanced against these principles, is the interest of society in the prompt final disposition of criminal prosecutions.

*Brady* left unanswered two questions: first, just what evidence was "material" enough to require a new trial, and second, whether its holding was based solely upon the fact of a specific request for clearly defined evidence. The courts have struggled over *Brady's* import for 12 years without having achieved a degree of consistency. But, keeping in mind the dual purposes served by reversing convictions upon findings of suppression, and balancing the desire for truth with the interest in finality, we believe a proper standard can be articulated. We take as our guidepost the oft-cited and well-reasoned discussion by Judge Friendly in *United States* v. *Keogh*, 391 F.2d 138 (2d Cir. 1968). The court there adopted a variable standard of materiality, differing in degree with the prosecutor's culpability in the nondisclosure. First, there are the "easy cases" where there is a deliberate suppression or withholding of evidence which is of obviously high value to the defense. The second category is encompassed by *Brady*. There is a request and a nondisclosure of material evidence. The prosecutor's motives in giving a negative response to the defense's request are irrelevant. Third are the cases where there is no intentional deceit, and no request, but hindsight discloses that the defense could have put the evidence to good use. This was the situation in *Keogh*. There, the court held that the standard of mate-

riality must be higher than in either of the other two situations. In the "request" cases, the defense action has "flagged" the potential importance of the evidence in question, and where a prosecutor fails to honor a defense request, although he may have done so in good faith, he has only himself to blame. However, where the prosecution is blameless and the usefulness of the evidence becomes obvious after the trial has concluded, the importance of arriving at the truth through a fair trial still remains. This interest, while not to be disregarded, nonetheless requires that to overturn the conviction the defendant must persuade the court that the nondisclosed evidence possesses the requisite degree of materiality.

Thus, whereas some courts have held the materiality standard of *Brady* is satisfied where the withheld evidence would have had an effect only on trial preparation, *United States v. Donatelli*, 484 F.2d 505 (1st Cir. 1973); *United States v. Polisi*, 416 F.2d 573 (2d Cir. 1969), we would not accept such a showing as sufficient to meet the standard of materiality without a request. Likewise, the Second Circuit, in *United States v. Miller*, 411 F.2d 825, 830 (2d Cir. 1969), has, where there was a specific request, overturned the conviction where the evidence would have been helpful only in attacking the credibility of the state's major witness. The court noted that the withheld material would only have "added another arrow to the rather large quiver trial counsel for the defense shot at (the witness)." Of course, oftentimes the request situation will resolve itself into either a deliberate suppression, or an inadvertant nondisclosure, depending upon the actions taken by the prosecution after an appropriately specific defense request has jogged the prosecutor's memory and made him aware of the defendant's belief that the evidence would be helpful.

There is still *Keogh's* third category of cases: the evi-

dence which hindsight discloses could have been helpful to the defense. Here a higher degree of materiality must be shown. *Accord, Clarke* v. *Burke,* 440 F.2d 853 (7th Cir. 1971); *Rhinehart* v. *Rhay,* 440 F.2d 718 (9th Cir. 1971).

In *United States* v. *Kahn,* 472 F.2d 272, 287 (2d Cir. 1973), the court stated that when the government's non-disclosure is strictly unintentional, there being no request whatever, the defendant, while not obliged to show the probability of a different verdict upon retrial, must show there is a significant chance that the use and development of the withheld evidence by skilled counsel at trial would have produced a reasonable doubt in the minds of enough jurors to avoid a conviction. The "significant-chance" rationale is the criterion that we shall adopt for determining materiality[3] in those cases of absolutely un-intentional, inadvertent suppression of evidence.

The adoption of this standard will best effectuate the dual policies of the desire for truth and the need for expeditious and conclusive disposition of criminal matters. "We do not * * * automatically require a new trial whenever 'a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict * * *.'" *Giglio* v. *United States,* 405 U. S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d

---

[3]Several tests have been adopted for determining materiality. In Maine, material evidence is that "* * * clearly relevant and helpful to the defense and having a tendency to exonerate the accused by reason of its probative effect upon important issues in the case, whether of facts or credibility of witnesses." *State* v. *Emery,* 304 A.2d 908, 912-13 (Me. 1973). The test has also been expressed as where the evidence has been patently immaterial, the harmless error standard has been applied. *United States* v. *Davila-Nater,* 474 F.2d 270 (5th Cir. 1973). Still other jurisdictions have applied a rather simple standard, *i.e.,* whether the non-disclosure prejudiced the defendant. *United States* v. *Brumley,* 466 F.2d 911 (10th Cir. 1972); *see* Comment, *Brady* v. *Maryland & The Prosecutor's Duty to Disclose,* 40 U. Chi. L. Rev. 112 (1972).

104, 108 (1972), quoting from *United States* v. *Keogh*, 391 F.2d 138, 148 (2d Cir. 1968).

Having established the various standards for determining the materiality of the suppressed or undisclosed evidence, we now find that there is absolutely nothing before us to which we can apply those standards.

We do know that on October 8, 1971 a suitable request was made by petitioner that the state furnish him with all evidence which was either exculpatory or favorable[4] to the accused, including any evidence which could be used to impeach the credibility of the state's witnesses. Some months later, the state filed a response in which it denied having any such evidence.

Having discussed the various principles of law and having reviewed the facts which are derived from a study of the affidavits, pleadings, and the new trial motion, we have reached, in a manner of speaking, a "dead end." We do not know if the state in obtaining the conspiracy conviction made a knowing use of perjury. We cannot decide if the real thrust of Mrs. Miller's affidavit is that the state wilfully suppressed or negligently withheld after a proper demand her statements as to her husband's whereabouts

---

[4]While the language in *Brady* v. *Maryland*, 373 U. S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), has led to some confusion, courts generally have held that even when no request is made, there is a duty to disclose to the accused material favorable evidence. *State* v. *Dukette*, 113 N. H. 472, 309 A.2d 886 (1973); *State* v. *Kelly*, 216 Kan. 31, 531 P.2d 60 (1975). We would emphasize that the duty to disclose not only embraces evidence that is directly related to the innocence of the accused such as a mistaken identity by an eyewitness or a favorable report relating to physical evidence or his mental status, but it may also embrace indirect evidence that is being used against the accused. Comment, *Prosecutor's* ises of leniency, all of which can affect the weight of credibility of the evidence that is being used against the accused. Comment, *Prosecutor's Constitutional Duty of Disclosure-Developing Standards under Brady* v. *Maryland*, 33 U. Pitt. L. Rev. 785 (1972). Further discussion of all facets of the prosecutor's duty can be found in Annot., 34 A.L.R.3d 16 (1970).

on certain occasions when the alleged conspirators were seeking to effectuate their nefarious scheme. As noted earlier, it seems that the trial justice in denying petitioner's motion for a new trial regarded Mrs. Miller's affidavit as if it were being submitted to support a new trial on the ground of "newly discovered" rather than "suppressed" or "nondisclosed" evidence. The trial justice made no effort to resolve the conflict between Mrs. Miller's affidavit and those of the detectives. He just assumed the truth of her affidavit and ruled that it did not meet the requirements for "newly discovered" evidence that would mandate a new trial.

Now that petitioner has sharpened the focus of his attack, we shall remand the cause to the Superior Court for a hearing to be held by the trial justice who listened to the over 30 days of testimony at the trial. Mrs. Miller and the police officers may appear there and testify. The trial justice will determine if the conversation referred to by Mrs. Miller did in fact occur. If it did, he can then determine if we have a *Giglio* or a *Brady* situation, and he can assess the state's actions in the light of the relevant legal principles set forth in this opinion. The Superior Court hearing shall be considered as having been taken pursuant to the provisions of our post-conviction relief statute. Public Laws 1974, ch. 220, §3.

The petition for certiorari is denied pro forma, and this cause is remanded to the Superior Court for further proceedings.

*Bevilacqua & Cicilline, John F. Cicilline, John F. Sheehan,* for petitioner.

*Julius C. Michaelson,* Attorney General, *William G. Brody,* Special Asst. Attorney General, *John Austin Murphy,* Special Asst. Attorney General, for respondent.