Maurice LERNER

v.

John MORAN.

No. 87–187–C.A.

Supreme Court of Rhode Island.

June 10, 1988.

Barbara Hurst, Asst. Public Defender, for plaintiff.

James E. O'Neil, Atty. Gen., Thomas Dickinson, Asst. Atty. Gen., for defendant.

## OPINION

SHEA, Justice.

On March 27, 1970, the applicant for postconviction relief, Maurice R. Lerner, was convicted of one count of murder and

one count of conspiracy to murder Rudolph Marfeo and one count of murder of Anthony Melei. His convictions were affirmed by this court in *State v. Lerner*, 112 R.I. 62, 308 A.2d 324 (1973). In 1983, in the related trial of *State v. Manocchio*, John S. Kelley, the chief prosecution witness against Lerner, testified that he had committed perjury during Lerner's trial. Furthermore, he testified that his perjury was elicited by Paul Rico, a special agent of the Federal Bureau of Investigation (FBI) who was assigned to the Marfeo/Melei homicide investigation.

After the Luigi Manocchio trial, Lerner filed an application for postconviction relief, asserting that the perjury suborned by the special agent of the FBI, both before the grand jury and at trial, had deprived him of his right to due process of law, guaranteed under the Fourteenth Amendment to the United States Constitution and article I, section 10, of the Constitution of Rhode Island. A hearing on Lerner's application was held, and the application was denied. The trial justice ruled that the perjury committed did not rise above the level of harmless error and that the state prosecutor at Lerner's trial had been wholly without knowledge of Kelley's perjuries.

Lerner maintains that the trial justice erred on two grounds in denying him a new trial. He contends that the perjury committed was material and prejudicial under either the federal standard established in *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), or the Rhode Island standard established in *In re Ouimette*, 115 R.I. 169, 342 A.2d 250 (1975). He also contends that the acts of the FBI should have been imputed to the state. We reverse.

This court's opinion in *State v. Patriarca*, 112 R.I. 14, 308 A.2d 300 (1973), discusses in detail the evidence presented at Lerner's trial. In this opinion we shall limit our discussions to those facts specifically relating to the issues before us.

Kelley's perjured testimony at Lerner's trial involved two different areas: the factual circumstances surrounding the murders and the factual circumstances relating to the full extent of the promises made to Kelley by Special Agent Rico in exchange for Kelley's testimony.

In the Manocchio trial Kelley admitted that during Lerner's trial, at the direction of Special Agent Rico, he testified falsely in certain matters relating to the factual circumstances surrounding the murders. For example, during Lerner's trial Kelley testified that he had personally "cut down" the shotgun used in the murders. However, during the Manocchio trial, Kelley stated that his armorer had actually "cut down" the shotgun. Kelley said that Special Agent Rico had directed him not to mention the armorer's role in the murders. It appears that the armorer was a valuable FBI informant that Special Agent Rico wanted to keep on the streets.

Similarly, during Lerner's trial Kelley testified that he had met with codefendant and reputed-crime-boss Raymond Patriarca at a particular restaurant before the murders. Kelley stated that at this meeting Patriarca ordered that the Marfeo murder be carried out expeditiously. Later, at the Manocchio trial, Kelley denied that this meeting occurred at the restaurant he had previously named. Again, he stated that his testimony was suggested to him by Special Agent Rico. According to Kelley, the FBI had been conducting an investigation attempting to connect the owner of the restaurant with Patriarca. This investigation had cost the FBI millions of dollars, according to Kelly, and had met with no success. Apparently, Special Agent Rico believed that placing this key meeting at this restaurant owner's establishment would create useful circumstantial evidence against the restaurant owner.

Shortly before the Manocchio trial, Kelley was asked why he had committed these acts of perjury. He responded, "[M]y life was in [the FBI's] hands. [Special Agent Rico] said I had no alternative."

We are of the opinion that all Kelley's perjured testimony relating to the events surrounding the murders confirmed facts that were collateral to the issue of Lerner's guilt or innocence. Lerner argues that the use of this untruthful testimony

by the state constituted a violation of the holding in the landmark case *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed. 2d 215 (1963). *Brady* prohibits the suppression of *exculpatory* evidence by the prosecution in a criminal case. Here, because Kelley's lies were not material to the issue of Lerner's guilt, we find that there were no *Brady* violations in regard to these matters.

We believe, however, that Kelley's perjury at Lerner's trial relating to the extent of promises made to Kelley by the FBI in exchange for his testimony and Special Agent Rico's corroboration of that perjury were material to Kelley's credibility and therefore to the issue of Lerner's guilt.

At Lerner's trial Kelley was asked several questions about the benefits he was receiving in exchange for his testimony. He stated that Special Agent Rico promised him only immunity and "protection for his family." He stated that he was *not* promised income from the federal government, a new identity, or relocation. Kelley's testimony was then corroborated in all material aspects by Special Agent Rico. However, at the Manocchio trial, Kelley admitted that before the Lerner trial, Special Agent Rico had in fact promised him income from the federal government for the remainder of his natural life, a new identity, and relocation. When asked why he had lied during Lerner's trial about these promises made to him, Kelley stated, "Agent Rico told me I shouldn't tell all of these things because it looked like I was being paid; that I should just do as he said, and everything would come out all right."

▮ One of the "fundamental conceptions of justice" is that a prosecutor cannot manufacture or knowingly present perjured testimony to secure a conviction against a defendant in a criminal case. *Mooney v. Holohan*, 294 U.S. 103, 112, 55 S. Ct. 340, 342, 79 L. Ed. 791, 794 (1935); *see also Alcorta v. Texas*, 355 U.S. 28, 78 S.Ct. 103, 2 L.Ed.2d 9 (1957); *Pyle v. Kansas*, 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214

(1942). "Such a contrivance by a State to procure the conviction and imprisonment of a defendant is as inconsistent with the rudimentary demands of justice as is the obtaining of a like result by intimidation." *Mooney*, 294 U.S. at 112, 55 S.Ct. at 342, 79 L.Ed. at 794. *See also In re Ouimette*, 115 R.I. at 175, 342 A.2d at 253 ("[w]here the prosecutor has deliberately caused false evidence to influence some part of the criminal trial, he has violated the most basic precepts of due process[;] [t]he courts cannot allow the integrity of the criminal system to be undermined by the over-zealous prosecutor").

This principle was extended in *Brady v. Maryland*, where the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. at 1196–97, 10 L.Ed.2d at 218.

One of the key issues that often arises in *Brady*-type-cases is whether the exculpatory evidence was "material." The standard of materiality under federal law went through several changes before finally being resolved in *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).[1] Under the *Bagley* standard of materiality, "[t]he evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.* at 682, 105 S.Ct. at 3384, 87 L.Ed.2d at 494.

Rhode Island has adopted a standard of materiality that provides even greater protection to criminal defendants than is constitutionally required under *Bagley*. Shortly before the United States Supreme Court first commented directly on the materiality issue in *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976),

---

1. For a lengthy discussion concerning the changes in the federal standard of materiality, *see United States v. Bagley*, 473 U.S. 667, 674–

683, 105 S.Ct. 3375, 3379–3384, 87 L.Ed.2d 481, 489–494 (1985), and *State v. Wyche*, 518 A.2d 907, 908–09 (R.I.1986).

Rhode Island had cause to consider the issue in *In re Ouimette*. In *Ouimette* we adopted the approach taken by the Second Circuit in *United States v. Keogh*, 391 F.2d 138 (2d Cir.1968). *Ouimette*, 115 R.I. at 177, 342 A.2d at 254. *Keogh* established "a variable standard of materiality, differing in degree with the prosecutor's culpability in the nondisclosure." 115 R.I. at 177, 342 A.2d at 254. The *Keogh* court stated:

> "The easy cases—at least they now seem so—are where the prosecutor's suppression is 'deliberate,' by which we include not merely a considered decision to suppress, taken for the very purpose of obstructing, but also a failure to disclose evidence whose high value to the defense could not have escaped the prosecutor's attention. * * * Such cases rarely present a problem as to 'the degree of prejudice which must be shown'; almost by definition the evidence is highly material." *Keogh*, 391 F.2d at 146–47.

In *State v. Wyche*, 518 A.2d 907 (R.I. 1986), we stated our preference for the *Keogh* standard, which provides a greater measure of protection for criminal defendants than the *Bagley* standard. We stated specifically that "[w]hen the failure to disclose is deliberate, this court will not concern itself with the degree of harm caused to the defendant by the prosecution's misconduct; *we shall simply grant a new trial.*" (Emphasis added.) 518 A.2d at 910. Under the *Keogh* standard of materiality, the perjured testimony by Kelley concerning the promises made to him by the FBI agent is the "easy case" that requires automatic reversal.

The same result would follow even if we were to apply the *Bagley* standard of materiality to Kelley's perjury. Well before *Bagley* was decided, the issue of whether evidence solely relevant to a prosecution witness's credibility is material to a defendant's guilt or innocence came squarely before the United States Supreme Court in *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). In *Napue* the defendant was tried and convicted for the murder of a policeman. One of the defendant's accomplices, who had been previously convicted for the same crime, was the chief prosecution witness. During trial this witness denied receiving any consideration in exchange for his testimony. However, the prosecutor had in fact promised him consideration but did nothing to correct the perjury. The Court ruled that this credibility testimony was material and required reversal.

> "The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness. The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." *Napue*, 360 U.S. at 269, 79 S.Ct. at 1177, 3 L.Ed.2d at 1221.

*See also Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

*Bagley* made clear that reversal is not required in all cases in which credibility evidence is withheld by the government. Rather there must be a finding that there is a "reasonable probability" that, had the evidence relevant to the witness's credibility been disclosed, "the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682, 105 S.Ct. at 3384, 87 L.Ed.2d at 494. That standard is satisfied in this case. It is fair to assume that had the jury been made aware that Kelley had been promised income for the remainder of his life, a new identity, and relocation in exchange for his testimony, it would have found his credibility suspect. It is reasonably probable that his perjury in these matters affected the jury's verdict.[2]

---

2. Agent Rico in fact recognized the potential danger to the state's case if the truth were known about the promises made to Kelley in exchange for his testimony. When he directed Kelley to lie about these matters, he warned Kelley that if the jury knew that Kelley was a paid witness, it might not find his testimony to be worthy of belief.

Kelley's perjury cannot be seen as mere harmless error. In denying all the codefendants' motions for a new trial, the trial justice declared, "The State's case stands on the testimony of John J. Kelley." In specifically denying Lerner's motion for a new trial, the trial justice added, "The testimony of witness John J. Kelley ties defendant Lerner to these murders beyond a reasonable doubt."

Furthermore, this court, upon its first review of the evidence in this case, found that Kelley was the critical witness in the state's case. We stated "[T]he state relied primarily on the testimony of John J. Kelley of Watertown, Massachusetts, who testified after he had been granted immunity from prosecution." *State v. Patriarca,* 112 R.I. at 19, 308 A.2d at 305–06. We also noted that "it is clear that the testimony of Kelley, while it implicated all of the defendants in some degree in the case, was highly incriminatory of defendant Lerner." *State v. Lerner,* 112 R.I. at 98, 308 A.2d at 346. Given the central role of Kelley's testimony in the case against *Lerner,* Kelley's credibility as a witness was an extremely important issue facing the jury.

Having determined that a serious due-process violation was brought about by Special Agent Rico, we need not address the question of imputation of the federal agent's acts to the state. The due-process issue is dispositive. However, because the case is being remanded for a new trial, we shall consider Lerner's assertion that the grand jury indictment ought to be dismissed.

Lerner claims that Kelley committed the same acts of perjury before the grand jury that he had committed at trial. However, our review of the grand jury transcripts, presented as an exhibit during the hearing on the application for postconviction relief reveals no testimony by Kelley relating to promises he had received in exchange for his testimony. Rather, all his testimony before the grand jury contained in these transcripts concerned factual circumstances surrounding the murders. We have already established in this opinion that this area of untruthful testimony by Kelley was not material to Lerner's guilt or innocence.

Even if Kelley had perjured himself before the grand jury on matters relating to promises made to him by the FBI in exchange for his testimony, we would not dismiss his indictment. In *State v. Acquisto,* 463 A.2d 122, 126–27 (R.I.1983), the defendant alleged that the state suppressed certain exculpatory letters before the grand jury and that as a result the indictment against him should have been dismissed. We denied his appeal on the ground that even if the letters were exculpatory, the actions of the state did not constitute cause to invalidate the indictment. We quoted with approval the broad standard for affirming indictments established by the United States Supreme Court in *Costello v. United States,* 350 U.S. 359, 363, 76 S.Ct. 406, 408–09, 100 L.Ed. 397, 402–03 (1956): " 'An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on the merits. The Fifth Amendment requires nothing more.' " *Aquisto,* 463 A.2d at 127. Therefore, even if Kelley had perjured himself before the grand jury on matters relating to promises made to him in exchange for his testimony, dismissal of the indictment would not have been required.

We therefore hold that Kelley's perjury, elicited by the FBI, constituted material exculpatory evidence withheld in violation of the applicant's due-process rights. We also hold that the trial justice correctly denied the applicant's motion to dismiss his indictment.

For the reasons stated, the applicant's appeal from the denial of his application for postconviction relief is sustained and that portion of the judgment appealed from is reversed; the conviction of the applicant is vacated, and that case is remanded to the Superior Court for a new trial. That portion of the judgment denying the request for dismissal of the indictment is affirmed.