## STATE

v.

## Mostafa R. IBRAHIM.

No. 2002–101–C.A.

Supreme Court of Rhode Island.

Dec. 23, 2004.

Christopher R. Bush, Providence, for Plaintiff.

Arthur D. Parise, Warwick, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

PER CURIAM.

This matter came before the Supreme Court on the appeal of the defendant, Mostafa R. Ibrahim, from a Superior Court judgment of conviction entered on February 7, 2002, after a guilty verdict by a jury on one count of second-degree child molestation sexual assault in violation of G.L. 1956 § 11–37–8.3 and § 11–37–8.4.[1] The defendant had been charged with sexually assaulting the nine-year-old sister of his son's playmate while all three children were spending the day at the defendant's house. After the verdict, the defendant made a motion for new trial, which the trial justice denied, and he subsequently was sentenced to fifteen years, with three years to serve, and the balance suspended, with probation.

Mr. Ibrahim raises four issues on appeal. First, he asserts that the trial justice incorrectly applied the sentencing benchmarks. Second, he challenges the trial justice's jury instructions, contending that the "trial justice did not explain with precision and clarity that each element of the case had to be proven beyond a reasonable doubt," thereby denying him due process and a fair trial. Third, defendant argues that he was denied his statutory and constitutional rights, including the Sixth Amendment right to confrontation, the right to equal protection, and the right to effective assistance of counsel, all because of his "severe deficiency in understanding the English language." Lastly, defendant avers that the state violated his constitutional rights by failing to provide relevant discovery and potentially exculpatory evidence to him.

We directed the parties to appear and show cause why the issues raised in this appeal should not summarily be decided. After hearing the arguments of counsel and examining the memoranda filed by the parties, we are of the opinion that cause has not been shown, and proceed to decide the appeal at this time. For the reasons indicated in this ruling, we affirm the judgment of the Superior Court.

### Facts and Travel

On March 11, 2000, the victim, Sarah,[2] then nine years old, and her three-year-old sister spent the day at defendant's house. Mr. Ibrahim has a son who attended the same preschool as Sarah's sister. The de-

---

1. The criminal information sheet contained a second count of assault and battery in violation of G.L.1956 § 11–5–3. This count subsequently was dismissed, and the defendant was tried only on one count of second-degree child molestation sexual assault.

2. The name "Sarah" is fictitious.

fendant's wife had offered to watch the two girls for the day in return for their grandmother's baby-sitting her son two days earlier. This was the first occasion that Sarah and defendant had met.

After they arrived at defendant's house, the children watched a movie in the basement and ate their lunch. Sarah testified at trial that after the children had finished watching the movie, defendant came downstairs and asked her whether she wanted to play on the computer, also in the basement, but in an area that could not be seen from the place where the younger children were playing. Sarah said that she then sat down at the computer and proceeded to use an art program, while defendant stood next to her. She testified that at some point defendant came in contact with her by rubbing the lower part of his body against her hip area. He then put his hand under her shirt and started to rub her back, including her lower back, for several minutes. The defendant then stopped, showed Sarah another game on the computer and finally went upstairs, while Sarah resumed playing with the younger children.

Afterward, the children went upstairs to the living room, on the first floor, to play a board game. After playing several rounds of the game and watching some more television, Sarah testified, she became bored and eventually went into one of the upstairs bedrooms, where she had seen another computer, and sat down. After several minutes, defendant entered the room. Sarah testified that he again started to rub the lower part of his body against her. He then tried to kiss her on the mouth, but she turned away, and he kissed her, instead, on the cheek. According to Sarah, she then got up and escaped into defendant's son's bedroom across the hall. While this was happening, the two younger children were playing in the living room downstairs. The defendant's wife had left the house about ten minutes earlier to buy a board game.

Sarah further testified that she initially hid behind the bed in the second bedroom. When defendant entered the room, she told him she was looking for defendant's cat. Telling defendant that she was tired, she then sat down on the bed. According to Sarah's testimony, defendant came around the bed and got on top of her. He kneeled over her and pushed her onto the bed. The defendant then put his hands under her shirt, attempted to remove her bra with one hand and touched her breasts with the other, although she could not recall whether he touched her breasts over or under her bra. While she was still on the bed, defendant "French kissed" her by putting his tongue into her mouth. Sarah further testified that she told defendant "no, Mostafa, I don't want to do this," to which he replied "[Sarah], just a little." Being able to wiggle out from under him, Sarah ran into the basement, where she hid behind the boiler or furnace. After about five minutes, when she heard that defendant had come down into the basement, she managed to run upstairs and lock herself in the bathroom at the top of the basement stairs. She remained in the bathroom until defendant's wife returned home after what seemed to her to be about two hours or less. When she heard his wife enter the house she came out of the bathroom and told her that defendant had "tried to have sex with me." Then she called her grandmother, who came to defendant's house to pick her up. Sarah told her grandmother what had happened. The grandmother testified that when she arrived at defendant's house about fifteen to twenty minutes later, she found Sarah lying on the couch. She initially hoped that everything had been a mistake, as defendant's wife told her, but then Sarah told her that defendant had put his hands

under her shirt and in her pants and had kissed her using his tongue. The grandmother testified that before leaving defendant's house she spoke with defendant and his wife, and that defendant told her that he was just treating Sarah as he would his own daughter. She further testified that defendant then said, "I just wanted to hold her. I just wanted to kiss her. She is so pretty." According to Sarah's grandmother, defendant started to plead with her and urged her to think about his family. From defendant's house the grandmother and the two girls went to the house of their maternal great-grandmother. After arriving at the great-grandmother's house, she informed the girls' mother and then called the police.

That same night, Sarah and her mother went to the Warwick Police Department, where Sarah signed a statement. The statement was taken by Det. Mark Perkins and was written out by Sarah's mother because Sarah was very upset and nervous. Detective Perkins testified at trial on behalf of defendant that the statement did not mention the fact that defendant was rubbing up against Sarah, but that she said that defendant rubbed her back under her shirt, kissed her on the cheek, pushed her down on the bed, attempted to remove her bra, touched her breasts, and kissed her with his tongue. Sarah's statement also indicated that she hid in a bathroom for some period until defendant's wife came home.

During cross-examination, Sarah was asked whether any of her clothes had been ripped during the incident. She testified that she thought her shirt may have been ripped. Detective Perkins testified, however, that the statement gathered from Sarah did not mention any articles of clothing.[3] He also said that he did not gather any physical evidence in this case.

The next day, Det. Perkins went to the grandmother's house and obtained a written statement from her. The detective said that defendant willingly came to the police station when he was contacted the next day. The defendant signed a waiver of his *Miranda* rights. According to Det. Perkins, defendant denied all allegations of inappropriate contact with Sarah, saying that he only patted her on the back. The detective further testified that defendant denied that his wife had ever left the house during this day. When he posed the same question to defendant's wife, who was waiting in the parking lot, she told him that she had, in fact, left the house. Confronted with this statement by his wife, the detective testified, defendant accused her of lying.

Linda Ibrahim, defendant's wife, testified that the children arrived at her house at about 10 a.m. on March 11, and played together all day long while at her home. She said that her husband was downstairs with the children for a while, but that he came back upstairs and was working at the dining room table. Mrs. Ibrahim testified that at one point during the afternoon she and her husband engaged in sexual relations in the living room while the children were downstairs. She said that she and her husband subsequently showered, and that her husband then slept for a while, and she left the home to go purchase a game for the children at Wal–Mart. After returning from Wal–Mart, Mrs. Ibrahim attempted to put the game together as the children were playing. At some point, she came into the house from the garage and realized that Sarah had locked herself in the bathroom. Mrs. Ibrahim said that Sarah came out of the bathroom, appeared to

3. Sarah said on cross-examination that she did not tell the police officer everything during the initial interview because she was very agitated.

be crying, and told her that defendant had tried to French kiss her. Mrs. Ibrahim further testified that her husband does not French kiss, explaining that it is against his religion.

The defendant testified on his own behalf and denied touching Sarah inappropriately in any way. In addition, he denied ever French kissing either her or his wife. He testified rather that, after waking up from his nap around 4 p.m., he went into the basement and played a board game with the children. After finishing the game, he went over to the computer in the basement and started it up, when Sarah came over to him and asked to play on the computer. When Sarah used the computer, he patted her shoulder to praise her for her computer skills.

The defendant is a native of Egypt who came to the United States in 1993. He moved to Rhode Island after he was promoted from his job at GTECH Corporation in New York. At GTECH he was a project manager, troubleshooting electronic boards on lottery machines. At the beginning of his testimony, he said that he was "not good in English" and asked his attorney to speak slowly and ask questions clearly so he could give honest answers. His attorney agreed to do so. There was no further mention of defendant's language abilities by either defendant himself or his attorney.

The defendant was found guilty on June 27, 2001, and was sentenced on October 31, 2001, after the trial justice denied his motion for a new trial. He filed a notice of appeal on November 16, 2001. A final judgment of conviction, however, was not entered until February 7, 2002. We have held before that such a minor procedural flaw will not be fatal to the appeal. "In the interests of justice and to avoid undue hardship, * * * [w]e shall treat the appeal as if it had been timely filed after the entry of judgment." *Russell v. Kalian*, 414 A.2d 462, 464 (R.I.1980). We shall address the issues raised in his appeal *seriatim.*

## Sentencing Benchmarks

In his first issue presented on appeal, defendant argues that the trial justice applied the wrong sentencing benchmark and imposed too severe a sentence by sentencing him to fifteen years, with three years to serve and twelve years suspended, with probation. The defendant did not pursue a motion to reduce his sentence under Rule 35 of the Superior Court Rules of Criminal Procedure before filing this appeal.[4] We have stated previously that:

> "It is well settled that, in the absence of 'extraordinary circumstances,' this Court will not consider the validity or the legality of a sentence on direct ap-

---

4. Rule 35(a) of the Superior Court Rules of Criminal Procedure provides:

"**Correction, decrease or increase of sentence.**—(a) *Correction or reduction of sentence.* The court may correct an illegal sentence at any time. The court may correct a sentence imposed in an illegal manner and it may reduce any sentence when a motion is filed within one hundred and twenty (120) days after the sentence is imposed, or within one hundred and twenty (120) days after receipt by the court of a mandate of the Supreme Court of Rhode Island issued upon affirmance of the judg-

ment or dismissal of the appeal, or within one hundred and twenty (120) days after receipt by the court of a mandate or order of the Supreme Court of the United States issued upon affirmance of the judgment, dismissal of the appeal, or denial of a writ of certiorari. The court shall act on the motion within a reasonable time, provided that any delay by the court in ruling on the motion shall not prejudice the movant. The court may reduce a sentence, the execution of which has been suspended, upon revocation of probation."

peal. \* \* \* Rather, we have repeatedly held that the proper procedure for a review of a sentence begins in the Superior Court under Rule 35 of the Superior Court Rules of Criminal Procedure. \* \* \* In the event that a defendant continues to be aggrieved by the ruling of the Superior Court, this Court then will review the decision on appeal." *State v. Bettencourt,* 723 A.2d 1101, 1114 (R.I.1999) (quoting *State v. Collins,* 679 A.2d 862, 867 (R.I.1996)); *see also State v. Martinez,* 824 A.2d 443, 451 (R.I. 2003).

In *State v. Brigham,* 638 A.2d 1043, 1046–47 (R.I.1994), we held that allegations that a sentence was unlawful because the trial justice "considered improper criteria in imposing the sentence" did not amount to extraordinary circumstances. In *Bettencourt,* we reached the same result on an identical issue. *See Bettencourt,* 723 A.2d at 1114. Moreover, we held that no extraordinary circumstances arose when the hearing justice extended the defendant's sentence by imposing an additional probationary period. *State v. Vashey,* 823 A.2d 1151, 1156–57 (R.I.2003).

█ In the present case, the statutory penalty for second-degree child molestation sexual assault pursuant to § 11–37–8.4 is "not less than six (6) years nor more than thirty (30) years." Before sentencing defendant, the trial justice had an extensive discussion with the attorneys for the prosecution and the defense about which sentencing benchmark to apply in this case. The two benchmarks of the Superior Court Sentencing Benchmarks at issue are Benchmark 36A: "No relationship to victim—over clothing—one count. Less than jail to three years;" and Benchmark 36B: "No relationship to victim—under clothing **or** more than one count. 3–8 years." The trial justice recognized that the defense had presented a strong argu-

ment for applying Benchmark 36A, while the state had made an equally convincing argument for applying Benchmark 36B. The trial justice further indicated that the court would follow the prosecution's position, but that the sentence would be stayed pending further legal proceedings because there was disagreement whether the touching in this case had occurred over or under the clothing. The defendant subsequently was sentenced to fifteen years, with three years to serve. We note that the time ranges given in the sentencing benchmarks "represent time to be served in jail." Thus the sentence that defendant received, fifteen years imprisonment with three years to serve, is not only within the statutory parameters, it also is consistent with both benchmarks at issue in this case, albeit at the maximum term of one and the minimum of the other. We conclude, therefore, that defendant has not shown "extraordinary circumstances" such as would warrant our review of the sentence on direct appeal. Consequently, we are precluded from considering defendant's challenge to this sentence in the absence of "a determination made pursuant to a Rule 35 motion." *Bettencourt,* 723 A.2d at 1114. "The statutory 120–day period in which to seek Superior Court review of the sentence commences on the date of this opinion should the defendant choose to file such a motion." *Id.*

### Jury Instructions

Next, defendant challenges the trial justice's jury instructions. In particular, he argues that the instructions lacked the required "precision and clarity that each element of the case had to be proven beyond a reasonable doubt." The defendant further alleges that although the trial justice added the element that touching had to be for the purpose of "sexual gratification" to the jury instructions in a clarification, the

jury was not properly instructed that touching for the purpose of sexual gratification was a necessary element of the offense, which also had to be proven beyond a reasonable doubt.

The trial justice's instructions to the jury twice were interrupted by unrecorded bench conferences. The first time, the state's attorney asked whether both counselors could approach the bench. The second time, defendant's attorney made the same request. In both instances the record neither reflects the reason why the attorneys requested a bench conference, nor the content of the conference itself. However, both times, the trial justice made corrections to her jury instructions after the bench conferences. The first time, the trial justice noted that contrary to her previous instruction for second-degree child molestation sexual assault, the state had to show beyond a reasonable doubt only that the child was under the age of fourteen and that "the defendant touched her breasts, came into contact with her breasts." After the second bench conference, the trial justice said that the touching has to be "for the purpose of sexual arousal or gratification." In opposition to defendant's argument, the state says that defendant waived this issue by failing to properly raise it below.

■ "As established by this court, an issue that has not been raised and articulated previously at trial is not properly preserved for appellate review." *State v. Gomez*, 848 A.2d 221, 237 (R.I.2004) (quoting *State v. Donato*, 592 A.2d 140, 141 (R.I.1991)); *accord State v. Markarian*, 551 A.2d 1178, 1183 (R.I.1988) ("claims of error are deemed waived unless the specific grounds for the claimed error are effectively raised at trial"). "This directive specifically to object to errors at trial, the 'raise or waive rule,' is well established, and will not be disturbed unless 'basic

constitutional rights are concerned.'" *Id.* (quoting *Donato*, 592 A.2d at 141).

■ More specifically, Rule 30 of the Superior Court Rules of Criminal Procedure provides in pertinent part: "No party may assign as error any portion of the charge or omission therefrom unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds of the party's objection." "[A] failure to object to a jury instruction precludes review of the instruction on appeal." *State v. Pacheco*, 763 A.2d 971, 979 (R.I.2001) (citing *State v. Bertoldi*, 495 A.2d 247, 250 (R.I.1985)).

In addition, we have stated that "[g]eneral objections to instructions, without specific grounds, are not a sufficient basis for review by this court." *East Coast Collision & Restoration, Inc. v. Allyn*, 742 A.2d 273, 275 (R.I.1999) (quoting *Dyson v. City of Pawtucket*, 670 A.2d 233, 237 (R.I. 1996)). In that case we held, however, that a request for alternative instructions was sufficient to preserve the issue for appeal. *Id.*

■ In the present case, there is no information on the record revealing, specifically, that defendant's attorney objected to the trial justice's instructions when he asked to approach the bench. We can only surmise that this is what prompted the trial justice to clarify the instructions previously given to the jury. For the purposes of this opinion, we will assume that an objection indeed was raised to the trial justice. Clearly, however, the better practice is for counsel to articulate specific objections on the record to ensure that such issues are properly preserved for appellate review.

■ "[A] trial justice need only 'adequately cover [ ] the law' when instructing a jury." *State v. Kittell*, 847 A.2d 845, 849

(R.I.2004) (quoting *State v. Hurteau,* 810 A.2d 222, 224 (R.I.2002)). "On review, we examine the instructions in their entirety to ascertain the manner in which a jury of ordinary intelligent lay people would have understood them." *Id.* (quoting *Hurteau,* 810 A.2d at 225). "It is well settled that this Court will not examine a single sentence apart from the rest of the instructions, but rather 'the challenged portions must be examined in the context in which they were rendered.'" *Id.* (quoting *State v. Hanes,* 783 A.2d 920, 925 (R.I.2001)).

██ The trial justice in this case issued two corrections to the jury instructions. She initially gave an instruction that included the elements of second-degree sexual assault rather than second-degree child molestation sexual assault. After the first bench conference, she corrected the instruction, but omitted the required element that the alleged touching be for the purpose of sexual gratification. She again clarified her instructions after the second bench conference but, defendant maintains, did not specifically explain to the jury that sexual gratification was a "necessary element of the offense, which had to be proven beyond a reasonable doubt."

We are satisfied, however, that the trial justice's instructions, when viewed as a whole, contain all the necessary elements and standards. At the inception of the case, the trial justice told the jury that the presumption of innocence applies to defendant throughout the case and that the state has the burden of proof throughout the trial, while defendant is not required to prove or disprove anything to a jury. At the beginning of the jury instructions, the trial justice repeated that the presumption of innocence remains with defendant until he has been found guilty. In addition, the trial justice properly instructed the jury about the proper standard to be used in this case, saying:

"Members of the jury the state has this burden of proof beyond a reasonable doubt as to each element of the offense with which the defendant is charged. In this case the defendant is charged with Second Degree Child Molestation."

Despite mistakenly instructing the jury with the elements of second-degree sexual assault, the trial justice quickly corrected this mistake and informed the jury that "[w]ith Second Degree Child Molestation it is required only that the state prove beyond a reasonable doubt that the child was under the age of 14 which is not disputed in this case and that the defendant touched her breasts, came into contact with her breasts." To offset the previous mistake, the trial justice told the jury: "[t]he force and violence, forget about what I said, that the mere contact alone is sufficient to establish that offense because of the age of the child."

After the second bench conference, the trial justice added that the "contact with the breasts of the youngster, that contact has to be for the purposes of sexual gratification or arousal not simply by accident." When the trial justice was finished with the instructions and asked the attorneys whether there was "anything else before we choose the jury," both attorneys replied in the negative and there are no objections on the record.

Looking at the jury instructions as a whole, we are satisfied that they informed the jurors about all the elements the state had to prove beyond a reasonable doubt for the jury to return a guilty verdict in this case. In addition, the trial justice's comments about the burden of proof made it sufficiently clear that this burden applied to each element of the charge, and we reject defendant's argument that the trial justice was required to specifically address the burden of proof separately in

conjunction with each element. We conclude, therefore, that notwithstanding her original misstatements, the trial justice adequately explained the correct law and burden of proof to the jury, and that a group of ordinarily intelligent lay people would not have been confused by the trial justice's instructions.

### Deficiency in Understanding English

In his third claim on appeal, defendant argues that his severe deficiency in understanding the English language caused him to be denied various statutory and constitutional rights, including his Sixth Amendment right to confrontation, his right to equal protection, and his right to effectively assist his counsel in his own defense, and that the trial court should have appointed an interpreter.

At the inception of his testimony, defendant said, "I'm not good in English." He then continued to say: "You know you got to be very slow with me and if you please, if you please, if I need help for any other word in the question explained, you know, just to try to give me a clear question so I can answer honestly. I'm an honest man fighting for my life." To this self-serving disclaimer defendant's attorney replied "I will do that Mr. Ibrahim," before commencing his direct examination of defendant. At no other point during the trial was defendant's language proficiency ever raised again, nor did defendant or his attorney ask for the services of an interpreter. We, therefore, reiterate our above statement, that an issue that was not raised below is waived for appellate review. The only exception to this "raise or waive rule" concerns "basic constitutional rights." *Donato*, 592 A.2d at 141. "In order for the exception to apply, however, the error asserted must go beyond the level of harmless error, the record must be 'sufficient to permit a deter-

mination of the issue,' and counsel's failure to raise the issue must be premised upon 'a novel rule of law that counsel could not reasonably have known during the trial.'" *Id.* at 141–42 (quoting *State v. Estrada*, 537 A.2d 983, 987 (R.I.1988)). We are of the opinion that the present case does not constitute such an exception.

Several years ago, the Legislature enacted G.L. 1956 chapter 19 of title 8, pertaining to the use of language interpreters in legal proceedings. The policy underlying this statute is as follows:

> "[T]o guarantee the rights of persons who, because of a non-English speaking background, are unable to readily understand or communicate in the English language, and who consequently need the assistance of an interpreter be fully protected in legal proceedings in criminal matters * * *." Section 8–19–1.

Rhode Island case law is silent on the rights of defendants to an interpreter. "The United States Supreme Court has not yet recognized a constitutional right to a court-appointed interpreter." *United States v. Si*, 333 F.3d 1041, 1043 n. 3 (9th Cir.2003). The United States Supreme Court, instead, has recognized that the right to an interpreter is "a matter largely resting in the discretion of the trial court." *Perovich v. United States*, 205 U.S. 86, 91, 27 S.Ct. 456, 51 L.Ed. 722 (1907). Other states that have enacted foreign language interpreter statutes similar to the one in Rhode Island still hold that the appointment of an interpreter for a defendant is within the discretion of the trial court. In Minnesota, for example, the statute provides that "[i]t is hereby declared to be the policy of this state that the constitutional rights of persons handicapped in communication cannot be fully protected unless qualified interpreters are available to assist them in legal proceedings." Minn. Stat. § 611.30 (2002). Recently, the

Minnesota Court of Appeals, however, held that "[w]hether an interpreter shall be appointed for a defendant is within the discretion of the [trial] court." *State v. Cham,* 680 N.W.2d 121, 126 (Minn.Ct.App. 2004) (citing *State v. Perez,* 404 N.W.2d 834, 838 (Minn.Ct.App.1987)).

Although in this case the question of whether defendant was entitled to an interpreter was not preserved for our review, we acknowledge that a trial justice is entrusted with the discretion to appoint an interpreter if he or she determines that a defendant is unable to understand the English language adequately, whether or not a defendant specifically requests an interpreter. Moreover, we endorse the recommendation made by the First Circuit that the trial justice should make the defendant aware that he or she has a "right to a court-appointed interpreter if the court determines that one is needed, and, whenever put on notice that there may be some significant language difficulty, the court should make such a determination of need." *United States v. Carrion,* 488 F.2d 12, 15 (1st Cir.1973).

In the case before us, however, we are unable to conclude from the record that defendant's deficiency in English was so significant that the trial justice should have realized that an interpreter was necessary in order to protect his constitutional rights. At the time of the trial, Mr. Ibrahim had been living in the United States for approximately eight years, during which time he was employed by GTECH Corporation in New York and Rhode Island as a project manager in the engineering department. Although at the beginning of his direct examination he requested that his attorney speak slowly, and on several occasions asked that a question be repeated, it is not clear from the context of the proceedings that he did not understand the question because of a language problem or simply because the interrogator was speaking too quickly. Indeed, viewing his testimony as a whole it is not readily apparent that he did not have a basic, functional understanding of English. At one point, his attorney even described him as "verbose" and someone who "sometimes expresses too much * * *."

At the sentencing hearing, defendant said: "I really am not native English speaker. As my command of English is poor, I feel my thoughts were not communicated well. I feel I was placed at a disadvantage when I represented myself." Yet not once during or before the trial had he requested an interpreter. In the absence of such a request, defendant's contention that he was denied any statutory or constitutional right clearly lacks merit.

### Failure to Provide Relevant Discovery and/or Disclose Exculpatory Evidence

The defendant's last issue on appeal concerns the claim that his constitutional rights were violated because the state failed to provide him with relevant discovery and/or failed to disclose exculpatory evidence. More specifically, defendant asserts that the state should have provided the shirt that the victim wore during the incident and that allegedly was ripped by defendant. Detective Perkins, a witness for the defense, testified at trial that he did not seize any shirt from the victim during his investigation of the incident, nor did he mention the victim's clothing in his report. In fact, the issue of the allegedly ripped shirt first was brought out by defense counsel during cross-examination of the victim.

The state is required to produce exculpatory evidence. "The duty of the state to produce evidence favorable to the accused is grounded in the guarantee

of due process in a criminal trial and imposes an obligation on the prosecution to produce evidence that is 'material either to guilt or punishment,' even in the absence of a request by the accused." *State v. Chalk*, 816 A.2d 413, 418 (R.I.2002) (quoting *Cronan ex rel. State v. Cronan*, 774 A.2d 866, 880 (R.I.2001) and *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)). The first factor we look at in the due-process inquiry is the "reason for the nondisclosure." *Id.* Rhode Island applies the "deliberate suppression" standard to issues of this kind. *Id.* at 418–19. A deliberate suppression exists when the prosecution *"makes 'a considered decision to suppress * * * for the purpose of obstructing' or where it fails to 'disclose evidence whose high value to the defense could not have escaped * * * [its] attention.'"* *Id.* at 419 (quoting *Cronan*, 774 A.2d at 880).

■ We conclude that in the present case Det. Perkins had no reason to seize the shirt and, therefore, the state cannot be compelled to produce it. Thus, the state did not make a deliberate or considered decision to suppress the shirt. In her statement to the police, Sarah never mentioned that her shirt had been ripped. Nor does it appear that she was asked about her clothing by the detective. Indeed, the first indication that her shirt had been ripped was during her responses to counsel's questions on cross-examination in the following exchange:

"Q. [Defendant's attorney] Okay. Were any of your clothes damaged in any way?

"A. [Sarah] No.

"Q. [Defendant's attorney] No rips or tears?

"A. [Sarah] I heard a rip in my shirt when he lifted it up.

"Q. [Defendant's attorney] That's your best memory is the shirt was ripped?

"A. [Sarah] I heard it rip. I don't know if it was actually ripped. Yes. I was wearing my Dallas Cowboy[s] shirt, and it was ripped right here."

The defendant fails to articulate any reason why the police should have seized the shirt, much less why the shirt was of such a high value to defendant that it could not have escaped the state's attention. We conclude, therefore, that, as in *Chalk*, the nondisclosure of the alleged evidence in the present case falls into the category of "absolutely unintentional [and] inadvertent." *Chalk*, 816 A.2d at 419 (quoting *In re Ouimette*, 115 R.I. 169, 179, 342 A.2d 250, 255 (1975)).

■ In cases of inadvertent nondisclosures such as this one, we then consider the "prejudicial effect of the nondisclosure." *Chalk*, 816 A.2d at 419 (citing *State v. Oliveira*, 774 A.2d 893, 905 (R.I.2001)). When a nondisclosure is unintentional, "[t]he burden of establishing procedural prejudice * * * lies with defendant." *Oliveira*, 774 A.2d at 905 (quoting *State v. Squillante*, 622 A.2d 474, 478 (R.I.1993)). "[I]n order '[t]o demonstrate procedural prejudice on appeal, defendant must show that had the information been disclosed, there is a likelihood that trial counsel * * * could have created a reasonable doubt in the minds of one or more jurors to avoid conviction.'" *Id.* (quoting *State v. Garcia*, 643 A.2d 180, 187 (R.I.1994)). In the present case, the defendant never made such a showing. The defendant asserts that the shirt, if it was not ripped, would have served to impeach the victim's testimony. Conversely, the defendant asserts that if the shirt had been produced in a ripped condition, this would have demonstrated that the police did not thoroughly investigate the allegations against the defendant. We do not subscribe to the defendant's reasoning. The sexual assault

and its harrowing aftermath that Sarah described does not lose any of its depravity if the defendant did not, in addition, rip her shirt. The jury convicted the defendant on the basis of testimony at trial, testimony that it necessarily found credible. We do not agree that an intact shirt, showing that the defendant did not rip Sarah's clothing, would have served to create a doubt in the minds of one or more jurors that the alleged touching did not occur. Sarah's own testimony on this point was imprecise and somewhat equivocal. Moreover, we cannot assume that evidence of a ripped shirt at trial would have served any purpose other than to affirm in the jurors' minds the conviction that the defendant did, in fact, sexually molest Sarah. With respect to his second assertion, the mere fact that the police failed to seize the shirt was sufficient for the defendant to attempt to cast aspersions upon the thoroughness of the investigation. The defendant has not demonstrated to us how such an attempt would have created a reasonable doubt in the minds of one or more jurors. Rather, it is our conviction that his allegation of error in this regard lacks merit.

### Conclusion

Accordingly, the judgment of conviction is affirmed and the record will be returned to the Superior Court.