**Supreme Court**

No. 2010-410-C.A.
(K1/06-662A)

| | |
|---|---|
| State | : |
| v. | : |
| Robert Burnham. | : |

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Tel. 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

| State | : |
| v. | : |
| Robert Burnham. | : |

Present: Suttell, C.J., Goldberg, Flaherty, and Robinson, JJ.

## O P I N I O N

**Justice Flaherty, for the Court.** This case came before the Supreme Court on appeal from a judgment of conviction after a jury found the defendant, Robert Burnham, guilty of two counts of second-degree child molestation. The defendant filed a motion for new trial, but on November 26, 2008, the trial justice issued a written decision in which he denied the motion. He then sentenced the defendant to a term of thirty years, six to serve and the balance suspended, with probation. Before this Court, the defendant asserts that the trial justice erred: (1) when he denied his motion for new trial, which motion was founded on a claim that he was deprived of pretrial access to certain relevant hospital records and police reports; (2) when he failed to properly instruct the jury on the issue of the voluntariness of his police statement; and (3) when he improperly limited his cross-examination of the complaining witness. Because we are of the opinion that the defendant's arguments are without merit, we affirm the judgment of the Superior Court.

# I

## Facts and Travel

In 2006, defendant was indicted by a grand jury on two counts of second-degree child molestation and one count of first-degree child molestation. All counts involved a single female, and all counts were alleged to have occurred between January 1, 2006, and June 8, 2006.[1]

Before trial began, defendant's pretrial counsel issued a number of subpoenas under Rule 17(c) of the Superior Court Rules of Criminal Procedure,[2] seeking medical records of the complaining witness, Jane,[3] including records from Jane's hospitalization at Butler Hospital. Pursuant to the subpoenas, records were returned to the motion justice from various social service and medical providers for in camera review by the motion justice. However, the motion justice did not review the records; rather, he followed his usual practice of allowing the attorneys

---

[1] Our examination of the record is made somewhat more difficult by the fact that there were two justices of the Superior Court involved in this case, as well as a number of different defense counsel. For the purpose of clarity, we shall refer to the justice who handled the pretrial matters as the "motion justice," and the justice who presided at trial and the posttrial motions as the "trial justice."

Also, we will refer to the attorney who represented defendant before trial commenced as "pretrial counsel," the attorney who represented defendant at trial as "trial counsel," and the attorney who argued the posttrial motions as "posttrial counsel."

[2] Rule 17(c) of the Superior Court Rules of Criminal Procedure states:

> "A subpoena may also command the person to whom it is directed to produce the books, papers, documents, or tangible things designated therein. The court on motion made promptly may quash or modify the subpoena if compliance would be unreasonable or oppressive. The court may direct that books, papers, documents or objects designated in the subpoena be produced before the court at a time prior to the trial or prior to the time when they are to be offered in evidence and may upon their production permit the books, papers, documents or objects or portions thereof to be inspected by the parties and their attorneys."

[3] To protect the privacy of the complaining witness, we have used a pseudonym.

to review the documents. It seems clear from the record that pretrial counsel invested considerable time going through the records.

On February 5 and 6, 2008, a jury trial was conducted in the Superior Court, in which both Jane and a detective testified for the state. Jane explained that the allegations in the indictment all had occurred in 2006, when she was twelve years old. She explained that defendant was a "friend of the family," who once had had a relationship with her mother. She further testified that defendant owned a house and that defendant's mother resided there with him. Jane said that she spent the night at defendant's house on three separate occasions and that it was on those occasions that the three incidents occurred. According to Jane, each time she stayed at defendant's house, she slept in defendant's mother's bedroom and she wore defendant's mother's pajamas.

At trial, Jane testified that the first time she slept at defendant's house, she woke up to discover defendant on top of her while she was lying on her stomach. She explained that defendant had one hand near her neck and the other hand on his penis. According to her testimony, defendant then proceeded to pull her pajama bottoms down, and he placed his penis on her buttocks and vagina. She said that when he tried to insert his penis in her vagina, she moved her leg and he left the room.

During the second incident, Jane again was sleeping on her stomach, and she again awoke to find defendant on top of her. As he did in the first incident, defendant pulled her pajama bottoms down and placed his penis on her thigh, buttock, and vagina. She testified that when he tried to put his penis in her vagina, she moved and, as had occurred during the earlier occasion, he left the room.

Before the third incident, Jane was at defendant's house, but she informed him she did not want to stay overnight. He replied that he was not going to bring her home because the weather had created poor driving conditions, and her mother was unable to pick her up because she did not have a car. Jane went to sleep, but she woke up, this time on her back, and realized that defendant was pulling her pajama bottoms down and inserting his penis in her vagina. She felt a sharp pain and made a sound, at which time defendant ran back to his room.[4]

Jane revealed to her best friend the molestation that had occurred, but she did not tell her mother right away "[b]ecause [Jane] used to watch America's Most Wanted and * * * [she] thought they would come after [her]." She explained that after the third incident, her attitude toward defendant went "down hill" and that she would act "bad[ly]" around him and "[b]eat him up." She said that at some point her mother asked her why she was behaving in this manner, and, at that time, she told her mother about the incidents. On June 8, 2006, her mother brought her to the Warwick Police Department to give a statement.

During cross-examination, defense counsel asked Jane a series of questions about a conversation Jane had with her mother about other sexual activity in which she may have been engaged, suggesting that this had led to the accusations that she made against defendant. The state objected to the line of inquiry, citing Rule 412 of the Rhode Island Rules of Evidence,[5] and

---

[4] During direct examination, Jane conceded that, during a meeting she had with the prosecutor the week before the trial, she had indicated that she had been wearing jeans when the third incident occurred, but the next day, she told the prosecutor that she had been wearing pajamas. She explained that the reason for this inconsistency was that she had had bad dreams about the incidents, and, in one of those nightmares, she was wearing jeans.

[5] Rule 412 of the Rhode Island Rules of Evidence provides, in pertinent part:

> "If a defendant who is charged with the crime of sexual assault intends to introduce proof that the complaining witness has engaged in sexual activities with other persons, he or she shall give notice of his or her intention to the court and the attorney for the state. The notice shall be given prior to the introduction of any

the trial justice sustained the objection because defendant had failed to provide prior notice of his intention to introduce any evidence of Jane's purported sexual activity.

The state then called Det. Timothy Grant of the Warwick Police Department, who had investigated the incidents in question. He explained that, after interviewing Jane, he and another officer went to defendant's home and informed him that he was the subject of an investigation. The detectives requested that defendant accompany them to the Warwick Police Department to assist in the investigation. Detective Grant then said that when the officers offered defendant the option of either driving himself to the station or riding with them, defendant chose to travel with the detectives. On the way to the station, defendant asked "if the case involved [Jane]," even though the officers had not yet referred to Jane by name. The officers brought defendant to a ten-foot-by-ten-foot room and read his <u>Miranda</u>[6] rights to him. The defendant acknowledged that he understood his rights, and he signed his name and provided his address on the rights form.

Detective Grant testified that during the interview at the police station, defendant acknowledged that he was a friend of Jane's family and that she had stayed overnight at his home on three occasions. Detective Grant observed that during the conversation about the sleepovers, defendant became nervous and fidgety and that he would not maintain eye contact with the officers. He also testified that defendant said that Jane had worn tight jeans each time she slept at his home, but that he later stated that he remembered Jane wearing his mother's pajamas on one occasion.

---

evidence of such fact * * *. Upon receiving such notice, the court shall order the defendant to make a specific offer of the proof that he or she intends to introduce in support of this issue."

[6] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

Detective Grant then explained that he revealed to defendant that Jane had provided the detectives with a police statement, and he informed defendant of what she had said in that statement. The defendant initially responded by asserting that he "never touched [Jane]" and that he had never been in the bedroom where Jane slept when she stayed overnight. To the contrary, defendant asserted that Jane had come into his bedroom and "came on to him," asking him to massage her back and rub her hair. The defendant conceded that he was sexually attracted to Jane—although he knew she was only twelve—and said that if she had been thirteen years old he would have considered having sex with her.

Detective Grant noted that, as the interview continued, defendant made comments that he "didn't want to bag himself" and that "if he had known [the detectives] were coming to talk to him, he would have prepared himself more for an interview." Detective Grant also observed that defendant was becoming "more and more nervous visibly, * * * very fidgety in the chair, looking around, * * * and trembling slightly."

Eventually, defendant conceded to the detectives that, on one occasion, he was having sexual thoughts about Jane and, at approximately 2:30 a.m., he went into the bedroom where she was sleeping. He said that he sat on the bed and watched her. He explained that he became aroused and rubbed against her through his shorts. He further admitted that he pulled Jane's pajama bottoms down and that he "rubbed the inside of her thigh and may have rubbed against her vagina" with his hand. He swore to the officers that he did not penetrate Jane, but after the officers advised defendant about Jane's "very detailed statement"—where she recalled him straddling her and attempting to place his penis inside her vagina—he responded, "I'm not saying she made it up," and "[s]he's a very smart girl." The defendant then became teary-eyed and commented to Det. Grant that "if I touched her, I'm sorry."

- 6 -

At this point, after about two hours of being interviewed, defendant agreed to give a written statement.[7] Detective Grant testified that he wrote the statement himself because defendant was illiterate. Detective Grant testified that he went over small segments of the statement—one at a time—with defendant, writing them down and reading them back to him.[8]

---

[7] Pretrial counsel filed a motion to suppress defendant's statement before the trial, but the motion justice denied the motion after he concluded that defendant's statement had been voluntary. The motion justice provided support for his reasoning for this conclusion, including that (1) defendant asked police whether the investigation was about Jane even though the police did not mention her name; (2) defendant agreed to ride with the detectives to the police station; (3) defendant's fidgety and nervous demeanor and behavior prior to giving the police statement; (4) defendant's signature and initials on the <u>Miranda</u> rights form; (5) the atmosphere and conduct of the police officers during the interrogation; and (6) the method by which the written statement was taken.

[8] The statement defendant gave is as follows:

> "I, Robert Burnham, have known [Jane's] family for about seven years. I dated [Jane's mother] for about five months several years ago. Since then I have been friends with her. Since I have lived in Warwick, approximately two years, I have had [Jane's mother]'s children, [Jane's brother and Jane], sleep over on occasion. [Jane] slept over three times alone. The children did not sleep over together. The last time I remember [Jane] sleeping over was in January of 2006. My mother Marie went to work. She worked 11 p.m. to 7 a.m. on that night. I was alone with [Jane]. I started to have sexual thoughts about [Jane] after she went to sleep. [Jane] was sleeping in my mother's bedroom. I went into the bedroom wearing shorts and sat on the bed next to [Jane]. I found [Jane] attractive and looked at her while she was sleeping. I was aroused and had a hard-on. I rubbed my penis over my pants while watching [Jane]. I pulled [Jane]'s shorts down just past her butt. I did not pull her underwear down. I put my hand on her thigh inside and rubbed it. I may have touched her vagina over her underwear with my hand. I was lying down next to her at that point and my penis brushed her leg under my pants. I did this for about 20 minutes, and I said, 'I can't do this.' I pulled [Jane]'s pants up and left the room. I thought that she was sleeping. I could have penetrated her, but I did not. I did not touch her vagina with my penis. I did not insert my fingers in her vagina.
>
> "On other times [Jane] has come on to me. She has asked me to rub her back and hair. I did this. I find [Jane] very attractive, and I wanted to have sex with her, but I could not get myself to completely do it. I found [Jane] different and I did not

- 7 -

When the statement was complete, Det. Grant read the finalized statement back to defendant, and he signed it.

On February 6, 2008, a jury found defendant guilty of the two second-degree counts of child molestation, but it was unable to reach a verdict on the first-degree charge. A mistrial was declared, but the state later voluntarily dismissed the remaining count of first-degree child molestation. On February 13, 2008, defendant retained new counsel and moved for a new trial. A hearing on the motion for a new trial took place on May 16, 2008. Alan B. Feinstein, a clinical psychologist, testified about a condition termed oppositional defiant disorder (ODD), with which Jane had been diagnosed at the age of four. Posttrial counsel explained that the ODD diagnosis was relevant to explain Jane's "violent altercations with people," which could explain why she "beat up" defendant. Posttrial counsel also sought to address the fact that Jane had nightmares "prior to any time when she was allegedly assaulted." Because both the ODD diagnosis and the nightmares were referred to in the Butler Hospital records, counsel argued that the Butler Hospital records should have been provided to defendant.

Pretrial counsel then testified; he was questioned about the extent to which he had reviewed the records that had been subpoenaed, including the Butler Hospital records. Pretrial counsel explained that he issued the subpoenas in April 2007 to Butler Hospital, the Kent Center, the Department of Children, Youth, and Families (DCYF), and the Family Court. Although he recalled certain records from DCYF and the Kent Center, he explained that he did not "remember whether or not [he] had possession of the records from Butler Hospital." He did

---

feel like that towards her brother. I know what I did was wrong and I feel very sorry for what I did. I never meant to hurt [Jane]. I ask[ed] Detective Grant to write this statement out for me because I am illiterate. I agree with this statement."

remember, however, that Butler Hospital "sent a letter to [him]" that "said they would be forwarding the records to [the motion justice] for his review."[9]

Pretrial counsel also described that he was familiar with the motion justice's procedure of conducting a review of subpoenaed medical records, whereby documents were delivered to the Superior Court and the attorneys would be permitted to review the records. He explained that he did not recall whether he was contacted by any member of the Superior Court about reviewing the Butler Hospital records, but he also said that he did not recall "being refused access" to the records. He "c[ould]n't say that [he] did or did not have a chance to review those records," and he explained that he "may have looked at them, but [he] d[id]n't remember." When presented with the Butler Hospital records for his review at the hearing, he noted that he "[did]n't recall seeing these, but the information contained therein, a lot of it [wa]s in the Kent Center records. Diagnoses were in there that [he] saw quickly, incidents of prior conduct [were] both in DCYF and Kent Center records."

Next, trial counsel was examined. He explained that he received a copy of pretrial counsel's files after he assumed responsibility for the case. He testified that he did not recall whether there were any records from Butler Hospital, but he did take note of the Rule 17(c) subpoenas. He testified that he "saw there were [Rule] 17(c) motions," but that he "paid no attention to what w[as] returned or not returned at that point," and he "did not make any independent follow-up to seek or secure the Butler Hospital records." He explained that he simply "relied upon the records [pretrial counsel] provided, assuming they were complete."

---

[9] The letter, which was marked as an exhibit and read into the record, provided that "this letter is to inform you that any records and treatment of [Jane], * * * at Butler, have been requested and will be sent directly to the Court within one week for an in-camera review by [the motion justice]."

Finally, a clerk of the Kent County Superior Court testified that the Butler Hospital records had been located in the motion justice's chambers, although they later were moved to another justice's chambers. He also explained that records produced for in camera review generally are sent to the trial justice and are not recorded in the clerk's office.

After the hearing, the parties submitted a stipulation about the travel of the Butler Hospital records, which included that the motion justice ordered the records "to be produced for an in camera review," "[t]he records were mailed directly to [the motion justice] on May 7, 2007," "[the motion justice] never looked at any of the records himself" because "[i]t was his practice to provide the records to the attorneys to review and designate what they needed for their case," but that "[the motion justice] recall[ed] provid[ing] some records * * * to [pretrial counsel] and a representative of the Attorney General's Office." Based on the testimony adduced at the hearing and the stipulation, the trial justice ultimately denied the motion for new trial on November 26, 2008, and final judgment was entered on January 2, 2009. This appeal ensued.

Before this Court, defendant raises the following issues: (1) the trial justice erred when he denied his motion for new trial; (2) the trial justice erred when he failed to properly instruct the jury on the issue of the voluntariness of defendant's statement to the police; and (3) the trial justice erred when he limited defendant's cross-examination of Jane.

## II

### Standard of Review

Under Rule 33 of the Superior Court Rules of Criminal Procedure, "[o]n motion of the defendant the court may grant a new trial to the defendant if required in the interest of justice." When we review a motion for a new trial under Rule 33, "[a] trial justice's ruling * * * will not

be overturned unless the trial justice was clearly wrong or unless he or she overlooked or misconceived material and relevant evidence that related to a critical issue in the case." State v. St. Michel, 37 A.3d 95, 100 (R.I. 2012) (quoting State v. Cerda, 957 A.2d 382, 386 (R.I. 2008)).

Further, the standard of review that this Court uses when reviewing jury instructions is well settled: the jury charge "need only 'adequately cover[] the law.'" State v. Lynch, 19 A.3d 51, 58 (R.I. 2011) (quoting State v. Cardona, 969 A.2d 667, 674 (R.I. 2009)). "Jury instructions are reviewed 'in their entirety to ascertain the manner in which a jury of ordinary intelligent lay people would have understood them * * *.'" Id. (quoting Cardona, 969 A.2d at 674). "[A]n erroneous charge warrants reversal only if it can be shown that the jury 'could have been misled' to the resultant prejudice of the complaining party." Id. (quoting State v. Sivo, 925 A.2d 901, 913 (R.I. 2007)).

Finally, "[o]ur standard of review of a trial justice's admission of evidence is for an abuse of discretion." State v. Reyes, 984 A.2d 606, 614-15 (R.I. 2009). "The trial justice's decision will be upheld unless the trial justice abused his or her discretion and the admission of irrelevant evidence was prejudicial to a defendant's rights." Id. at 615 (quoting State v. Evans, 742 A.2d 715, 719 (R.I. 1999)). "The trial justice will not have abused his or her discretion as long as some grounds supporting his or her decision appear in the record." Id. (quoting Evans, 742 A.2d at 719).

# III

## Analysis

### A

### Motion for a New Trial

#### 1

#### Medical Records

The defendant argues that the trial justice erred when he denied his motion for a new trial because he was not provided with pretrial access to the Butler Hospital records, because neither the motion justice nor the trial justice conducted an <u>in camera</u> review of those records. This, he contends, deprived him of his rights to compulsory process and confrontation under the United States and Rhode Island Constitutions. Before this Court, defendant urges that he was prejudiced at trial because he could have used the records to attack Jane's credibility. The state responds that defendant failed to meet his burden for a new trial grounded on a claim of newly discovered evidence because the hospital records were easily discoverable prior to the trial, and, in any event, the documents would not have changed the verdict at trial.

We recognize that a request for confidential health-care information about another person often can create tension between a criminal defendant's right to effectively cross-examine witnesses and the public's interest in securing the confidentiality of certain types of information. <u>State v. Kholi</u>, 672 A.2d 429, 436-37 (R.I. 1996). However, a defendant's constitutional right to evidence does not include an unsupervised romp through another person's confidential health-care records or the right to make a materiality determination. <u>Id.</u> at 437. An <u>in camera</u> review of sensitive or personal information strikes the requisite balance between those two interests and satisfies due process requirements. <u>Id.</u>

When he ruled on defendant's motion for a new trial, the trial justice made a finding that defendant had served a Rule 17(c) subpoena on Butler Hospital, in which he sought the production of medical records relating to any treatment that Jane may have received. Butler Hospital responded with a motion to quash, which was denied by the motion justice. Thereafter, Butler Hospital notified pretrial counsel by letter, dated May 4, 2007, that it would provide the records to the motion justice. Even though Butler Hospital produced the documents to the court, there is no evidence that either pretrial counsel or trial counsel sought to review them. Pretrial counsel testified at the hearing on the motion for new trial that he did not remember whether he reviewed the records; he did, however, recall receiving the letter from Butler Hospital informing him that the records would arrive at the court within a week. Further, trial counsel testified that he saw the Rule 17(c) subpoena when he was reviewing the case file, but he acknowledged that he did not follow up to determine whether the court had the Butler Hospital records.

The trial justice also found that pretrial counsel was well aware of the regular procedure that the motion justice followed when he received records for in camera review, which was to put them aside for the attorneys' later perusal. When he weighed the merits of the motion for new trial, the trial justice took into consideration that pretrial counsel had, in fact, reviewed a number of other subpoenaed records that had been provided to the court. Indeed, the trial justice noted that the records that had been received in response to other subpoenas served upon DCYF and the Kent Center were contained in envelopes that had been examined by pretrial counsel, as evidenced by his signature and the date of June 14, 2007, as well as a notation on the envelopes containing the documents that he "examined" the records but they were "not needed." The trial justice also noted that these records reviewed by pretrial counsel reflected Jane's ODD diagnosis and nightmares, before, during, and after Jane's hospitalization at Butler Hospital.

- 13 -

Accordingly, we hold that defendant was not deprived of his rights to compulsory process or confrontation because both pretrial counsel and trial counsel were afforded access to the Butler Hospital records. There is no evidence that either the motion justice or the trial justice hindered defendant from getting access to or reviewing those records in any way.[10]

The defendant relies on this Court's holding in State v. Kelly, 554 A.2d 632 (R.I. 1989), as support for his argument that he was deprived of his right to compulsory process and his right to confrontation. In that case, we held that a flat refusal by a trial justice to order the production of a witness's DCYF records on the grounds of confidentiality denied the defendant his right to effective cross-examination. Id. at 636. Here, however, unlike in Kelly, defendant was never deprived of an opportunity to review the Butler Hospital records. The motion justice ordered the records to be produced for an in camera review, and, after its motion to quash was denied, Butler Hospital provided the attorneys with notice that the records were being produced in accordance with the court's order. We have no hesitation in concluding that failure to take advantage of this opportunity should not, and does not, create a basis for a new trial.[11]

However, even if there had been an error based on the failure of the motion justice to conduct in camera review, defendant would not be entitled to a new trial, because there was no material prejudice to defendant. In Pennsylvania v. Ritchie, 480 U.S. 39, 58 (1987), the United States Supreme Court held that a new trial is warranted only if a subsequent in camera review of the records discloses information "that probably would have changed the outcome of [a] trial."

---

[10] In fact, it cannot be gainsaid that the motion justice's practice of providing attorneys with the opportunity to review the records and determine what they needed afforded defendant greater protection of his rights than if an in camera review had been conducted by the judge. See Pennsylvania v. Ritchie, 480 U.S. 39, 59 (1987).

[11] Similarly, defendant cites Love v. Johnson, 57 F.3d 1305 (4th Cir. 1995) and Ritchie, but these cases also are distinguishable, because, in those cases, the defendants were affirmatively denied access to certain records without the court's first reviewing those records.

- 14 -

In this case, the trial justice explained that he "conducted a page-by-page review of the subject hospital records and * * * found that none of them need[ed] [to] have been disclosed to trial counsel," and "[a]fter performing the balancing test required by [G.L. 1956] §§ 5-37.3-6.1(d) and (e), * * * any perceived need for the information contained therein does not 'clearly outweigh the privacy interest of the individual' involved * * *." The trial justice considered the particular information in the Butler Hospital records about Jane's nightmares and ODD diagnoses, and he found that they were "well documented throughout the records reviewed and copied by [pretrial counsel]." The Kent Center records, dated January 4, 2005—which were more proximate in time to the incidents alleged in the indictment than were the Butler Hospital records—refer to Jane's "frequent bad dreams," and the other records that pretrial counsel did review are replete with more than seventy references to Jane's ODD diagnosis. As a result, the motion justice ultimately concluded that on this evidence he would have found defendant guilty, as did the jury. Accordingly, after reviewing the record before us, we conclude that the motion justice did not err when he rejected defendant's motion for new trial.

**2**

**Police Statement**

The defendant next contends that the trial justice erred in rejecting posttrial counsel's argument that the state was required to produce certain police statements that either mentioned or were provided by Jane. The defendant argues that withholding Jane's police statement from him violated the state's obligations under Rule 16 of the Superior Court Rules of Criminal Procedure and Brady v. Maryland, 373 U.S. 83 (1963).[12] The state responds that it had no obligation to produce those statements, that defendant did not overcome the evidentiary burden for a new trial

---

[12] Brady v. Maryland, 373 U.S. 83 (1963) is the seminal case that stands for the proposition that the prosecuting authority must timely disclose all "exculpatory" information of which it is aware.

because the police statements easily were discoverable prior to the trial, and that, in any event, the statements were not material to the issues tried before the jury.

We review a trial justice's decision about whether a violation of Rule 16 or a <u>Brady</u> violation has occurred with great deference to the trial justice, and we will not disturb his or her ruling unless he or she has committed clear error. <u>State v. McManus</u>, 941 A.2d 222, 229 (R.I. 2008) (citing <u>State v. Briggs</u>, 886 A.2d 735, 755 (R.I. 2005)). When a criminal defendant requests discovery material concerning witnesses whom the state may call to testify at trial, Rule 16(a)(8) obligates the state to provide "written or recorded verbatim statements, signed or unsigned, of such persons" it expects to call as witnesses; and failure to comply with the obligation may subject the state to a variety of sanctions, based on Rule 16(i). <u>See State v. Chalk</u>, 816 A.2d 413, 418 (R.I. 2002).

Beyond the mandates of Rule 16, the due process requirements of the United States Constitution, as interpreted in <u>Brady</u> and its progeny, and the Rhode Island Constitution require the state to turn over information that "(1) constitute[s] either exculpatory or impeachment evidence and (2) [is] material to the outcome of the case or sentencing." <u>State v. Wyche</u>, 518 A.2d 907, 909 (R.I. 1986). In order to demonstrate that a <u>Brady</u> violation has occurred, a defendant has the burden of showing that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." <u>McManus</u>, 941 A.2d at 230 (quoting <u>Cronan ex rel. State v. Cronan</u>, 774 A.2d 866, 880 (R.I. 2001)). However, the prosecution is not responsible for delivering information that is not within its custody or control. <u>Wyche</u>, 518 A.2d at 909.

At issue are thirteen police reports of the Warwick Police Department that either refer to or name Jane. But only two of the documents contain "written or recorded verbatim statements"

by Jane. See Rule 16(a)(8). Both are witness statements that Jane wrote about criminal incidents to which she was an eyewitness; neither relate to the allegations of the instant case in any way. The other documents contain non-verbatim statements—which the state is not required to produce under Rule 16(a)(8)—allegedly made by Jane to the police. These also pertain to matters not relevant to this case; two reports relate to crimes committed by third parties, one to a curfew/loitering/vagrancy of another juvenile who Jane was allegedly with, one to Jane's unauthorized operation of a motor vehicle, five about Jane being missing or a runaway, one about Jane being "extremely disrespectful, staying out late, * * * involved with drug use, and * * * sexually active with older boys," and one to a coyote attack that Jane observed. None of the reports, however, relates to the incidents that were the subject of the trial. Other than generally suggesting that these police reports somehow might indicate that Jane was a troubled child, defendant has failed to specifically indicate any way in which the reports might be considered to be material or that the outcome of the trial might have been different had defendant been provided access to them before the trial.[13] Therefore, we agree with the trial justice's determination that the police reports were not discoverable under Rule 16.

---

[13] We note that defendant does argue that at least one police report, which was unrelated to the underlying sexual assault, demonstrates Jane's propensity to tell inconsistent and untruthful stories to the police and might warrant an inference against her credibility. Although the police report indicates that Jane "changed her story several times and there were inconsistencies with her observations at the scene," there is no nexus between Jane's sexual assault and the crime Jane described in the police report on December 16, 2006, which occurred almost six months after the last sexual assault was alleged to have occurred. Accordingly, we conclude that the trial justice did not abuse his broad discretion in finding that it was "incomprehensible" as to how the "perceived inconsistencies" in the police statement could be properly used to impeach her and that, therefore, the police report was "clearly not relevant." See Rules 401 and 402 of the Rhode Island Rules of Evidence. Indeed, this Court has consistently held that "[a] witness may not be impeached on collateral matters by the introduction of extrinsic evidence." State v. Viveiros, 45 A.3d 1232, 1243 (R.I. 2012) (quoting State v. Tutt, 622 A.2d 459, 462 (R.I. 1993); see Rule 608(b) of the Rhode Island Rules of Evidence ("Specific instances of the conduct of a witness,

- 17 -

With regard to the alleged <u>Brady</u> violation, there also was no evidence that the state possessed the reports prior to trial, or even that the state was aware of their existence. The trial justice performed a document-by-document review of all the police records, described each document in detail, and found that the statements were not exculpatory. He observed that defendant produced no evidence, nor was there any support in the record, that would indicate that the state deliberately failed to disclose the police reports. Further, the motion justice observed that a number of the incidents that were reported in the police statements also were referred to in the Kent Center and DCYF records, which pretrial counsel reviewed and copied. Accordingly, we hold that the trial justice did not err when he held that none of the information constituted exculpatory evidence that the state had an obligation to produce under <u>Brady</u>.

**B**

**Jury Instructions**

The defendant further contends that the motion justice failed to correctly instruct the jury on the "Humane Practice Rule" with respect to the voluntariness of his police statement.[14] "It is axiomatic that 'this [C]ourt will not consider an issue raised for the first time on appeal that was not properly presented before the trial court.'" <u>State v. Castellucci</u>, 771 A.2d 902, 903 (R.I. 2001) (mem.) (quoting <u>State v. Saluter</u>, 715 A.2d 1250, 1258 (R.I. 1998)). "A failure to object to a jury instruction precludes review of the instruction on appeal." <u>State v. Hallenbeck</u>, 878 A.2d 992, 1007 (R.I. 2005) (quoting <u>State v. Ibrahim</u>, 862 A.2d 787, 795 (R.I. 2004)).

_____

for the purpose of attacking or supporting the witness' credibility * * * may not be proved by extrinsic evidence.").

[14] The Humane Practice Rule provides an important procedural safeguard with respect to the constitutional rights of criminal defendants. <u>See</u> <u>State v. Dennis</u>, 893 A.2d 250, 261-62 (R.I. 2006). Our "Humane Practice Rule requires that judge and jury make separate and independent determinations of voluntariness * * *." <u>Id.</u> at 262. In other words, the Humane Practice Rule provides that any statement of a criminal defendant "may not serve as a basis for conviction unless both judge and jury determine that it was voluntarily made." <u>Id.</u>

The record in the present case is devoid of any evidence whatsoever that defendant raised an objection to the jury instructions.[15] Indeed, before he instructed the jury, the trial justice met with the attorneys and asked whether "either attorney ha[d] any current objections to the proposed charge or any additions that they want [him] to consider," or whether there were "any issues we need to discuss prior to bringing in the jury for purposes of final argument and charge." Defense counsel replied, "No, Your Honor." After he instructed the jury, the trial justice again asked the attorneys whether there were "any objections or requested additions to the charge that I've given to the jury," to which trial counsel responded, "neither an objection nor exception." Because defendant did not object to the finalized jury charge, this argument has been waived on appeal, and we shall not consider it. See Hallenbeck, 878 A.2d at 1007.

---

[15] A portion of the trial justice's final charge to the jury relating to the voluntariness issue is as follows:

> "As you are aware, the defendant made statements to the police while he was in their custody. You may not consider those statements as substantive evidence, however, unless you are satisfied in the first instance that the State has demonstrated by clear and convincing evidence; that is to say, by a high probability, that before making those statements, the defendant had been advised of certain constitutional rights, the so-called Miranda rights; namely, that the defendant had a right to remain silent; that anything he said could and would be used against him in court; that he had the right to have an attorney present before and during any questioning by the police and that if he desired an attorney at that time and could not afford one, an attorney would be appointed for him.
> "The State must also demonstrate from a totality of the circumstances that it is highly probable the defendant understood those rights and that thereafter he voluntarily wa[i]ved those rights in an intelligent and informed manner without threats or coercion or promises by the police."

# C

## Cross-Examination

Finally, defendant argues that the trial justice erred in limiting defendant's cross-examination of Jane about her refusal to undergo a physical examination in connection with her allegations of child molestation. Specifically, defendant argues that Jane's assertion that she did not want to be touched was manifestly untrue, based upon information available to defendant that her allegations first arose during a conversation with her mother about her sexual history. The state contends that defendant failed to adhere to the prerequisites of Rule 412 of the Rhode Island Rules of Evidence, as well as the requirements of G.L. 1956 § 11-37-13, before he cross-examined Jane about her purported prior sexual activity with third parties. Therefore, the state stresses, the trial justice properly decided to preclude trial counsel from going any farther concerning this line of inquiry.

"Inherent in a criminal defendant's constitutional right to confront witnesses against him or her—found in both article 1, section 10, of the Rhode Island Constitution and the Sixth Amendment to the United States Constitution—'is the fundamental right of the criminal defendant to cross-examine his or her accusers.'" State v. Rivera, 987 A.2d 887, 906 (R.I. 2010) (quoting State v. Drew, 919 A.2d 397, 411 (R.I. 2007)). This right to cross-examine, however "is not unbounded." Id. (quoting Drew, 919 A.2d at 411). "[T]rial justices are accorded wide discretion to curtail cross-examination after there has been 'sufficient cross-examination to satisfy the Sixth Amendment.'" Rivera, 987 A.2d at 906 (quoting Drew, 919 A.2d at 411). This Court reviews "[a] trial justice's decision to limit the scope of cross-examination * * * for clear abuse of discretion; the decision will be overruled 'only if such abuse constitutes prejudicial error.'" Id. (quoting Drew, 919 A.2d at 411).

Significantly, Rule 412, which is almost identical to § 11-37-13, provides, in pertinent part:

> "If a defendant who is charged with the crime of sexual assault intends to introduce proof that the complaining witness has engaged in sexual activities with other persons, he or she shall give notice of his or her intention to the court and the attorney for the state. The notice shall be given <u>prior</u> <u>to</u> <u>the</u> <u>introduction</u> <u>of</u> <u>any</u> <u>evidence</u> <u>of</u> <u>such</u> <u>fact</u> * * *." (Emphasis added.)

The statute and the evidentiary rule both require a defendant to provide notice, outside the presence of the jury, of his intent to inquire about the complainant's sexual activity with others. After notice is given, the trial justice "shall order the defendant to make a specific offer of the proof that he or she intends to introduce in support of this issue." Rule 412; § 11-37-13.

In this case, the defendant failed to provide any notice either to the court or to the state before he sought to cross-examine Jane about her alleged previous sexual conduct. By prohibiting this line of inquiry, the trial justice acted completely in accord with his responsibilities in light of the statutory provision and the rule of evidence. Moreover, the record reveals that the defendant was permitted to engage in extensive cross-examination: counsel vigorously explored Jane's relationship with the defendant, her visits to his home, the three incidents of sexual molestation, and her refusal to allow an examination by medical staff after the assaults.[16] Further, the trial justice found that Jane's "testimony regarding her refusal to consent to a gynecological examination may very well [have] lead to the jury's failure to agree on a verdict as to the count alleging sexual penetration, [but] the results of the examination, if any, would not have been probative as to the two counts of sexual contact." He also found that Jane's "consensual sex with other children, if any, would have been irrelevant and therefore

---

[16] Specifically, when asked why she refused to undergo a physical examination by a doctor after the incidents, Jane explained that it was "'[c]ause [she] d[id]n't want no one [sic] touching [her].'"

inadmissible," and her unwillingness to have an "unfamiliar doctor examine her body's most private parts was understandably more than [she] could bear." Accordingly, we hold that the trial justice did not abuse his discretion when he limited the defendant's cross-examination of Jane about her refusal to undergo a physical examination.

## Conclusion

For the reasons set forth in this opinion, we affirm the judgment of conviction in this case. The record shall be returned to the Superior Court.

Justice Indeglia did not participate.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**      State v. Robert Burnham.

**CASE NO:**      No. 2010-410-C.A.
(K1/06-662A)

**COURT:**      Supreme Court

**DATE OPINION FILED:**  January 18, 2013

**JUSTICES:**      Suttell, C.J., Goldberg, Flaherty, and Robinson, JJ.

**WRITTEN BY:**      Associate Justice Francis X. Flaherty

**SOURCE OF APPEAL:**    Kent County Superior Court

**JUDGE FROM LOWER COURT**:

Associate Justice Edwin J. Gale

**ATTORNEYS ON APPEAL:**

For State:   Christopher R. Bush
Department of Attorney General

For Defendant:  Thomas M. Dickinson, Esq.